## WINTERS et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1906.)

### No. 1,243.

1. INDIANS—TREATIES—RESERVATIONS—WATER FOR IRRIGATION.

Act May 1, 1888, c. 213, 25 Stat. 114, art. 2, reduced the size of the Montana Indian reservation under an agreement providing for Congressional donations in order to enable the Indians to become self-supporting as a pastoral and agricultural people. By the treaty the Indians ceded and relinquished their rights to certain lands not then reserved; the reservation being described as beginning at a point in the middle of the main channel of Milk river opposite the mouth of Snake creek, thence south, to a point, thence east, thence, in a northerly direction, in a direct line, to a point in the middle channel of Milk river, thence up the Milk river, in the middle of the main channel thereof, to the place of beginning, etc. *Held* that, the land reserved to the Indians being barren and worthless for agricultural purposes without irrigation, the treaty so confirmed should be construed as reserving for the use and benefit of the Indians residing on the reservation a portion of the waters of the Milk river for the irrigation of the reservation lands.

2. WATERS AND WATER COURSES—APPROPRIATION OF WATER—DESERT LAND LAW—PUBLIC RIGHTS.

A portion of the waters of Milk river having been impliedly reserved for the benefit of Indians cultivating the Ft. Belknap Indian reservation, by the treaties with such Indians, grantees of public lands outside

of the reservation could not acquire the exclusive right to appropriate all the waters of the river for irrigation under the desert land act (Act Cong. March 3, 1877, c. 107, 19 Stat. 377, as amended by Act Cong. March 3, 1891, c. 561, 26 Stat. 1906), authorizing appropriation by such owners of water for irrigation "subject to existing rights."

3. SAME—WATERS SUBJECT TO APPROPRIATION.

Desert land act (Act Cong. March 3, 1877, c. 107, 19 Stat. 377, as amended by Act Cong. March 3, 1891, c. 561, 26 Stat. 1096), authorizing the appropriation of waters of holders of land acquired under such acts, applies only to waters of the United States.

Appeal from the Circuit Court of the United States for the District of Montana.

This is an appeal taken from an' order secured by appellee (complainant in the court below) enjoining appellants (defendants in the court below) from interfering in any manner with the use of 5,000 inches of the waters of Milk river in the state of Montana. The order was made by the court upon a hearing under a rule to show cause why the preliminary injunction should not be granted. The suit involves the right of the appellee, and of the Indians residing upon the Ft. Belknap Indian reservation, to the use of the waters of Milk river for useful and beneficial purposes. This Indian reservation was established by the treaty or convention between the government of the United States and the Indians May 1, 1888 (25 Stat. 113–133, c. 213). Appellee's complaint is quite lengthy, as are also the affidavits and statements presented by the appellants at the hearing. We shall endeavor to condense the facts derived from the pleadings and evidence, and make a general reference to the statutes and treaties bearing upon the issues raised herein. The Indian reservation comprises an area of about 1,400 square miles, embracing about 1,000,000 acres of land, the greater portion of which is grazing land, "well adapted to stock raising." Act June 10, 1896, c. 398, 29 Stat. 351. There are, however, some portions thereof that are suitable for agriculture, and of these portions "approximately about 30,000 acres are susceptible of irrigation with the waters of Milk river." There is but little water to be found upon the reservation itself, and this scarcity of water "renders the pursuit of agriculture difficult and uncertain." 29 Stat. 351, c. 398. The center of Milk river is the northern boundary line of the reserve throughout its entire width, and this stream is the only source of supply for the various uses of the government and the Indians at the agency, and for irrigation purposes generally on the reserve. Since 1889 and 1890 a portion of the waters of the stream have been continuously used by the government and the Indians for household, domestic, and irrigating purposes, at and near the agency proper, and this is the only source of supply from which to satisfy their requirements and necessities at that place. Since the year 1898 water has been taken from Milk river by means of a canal and used on the reservation for the purpose of irrigating the cultivable lands susceptible of irrigation with the waters of that stream. As alleged in the complaint, "approximately 5,000 acres of land are being irrigated upon said reservation for the purpose of producing thereon crops of hay, grass, grain, and vegetables with the waters diverted by means of said canal and lateral ditches distributing said waters from said canal over the lands." This canal has a carrying capacity of at least 5,000 inches of water, and such amount of water is required for the present needs and requirements of the government and the Indians, for household, domestic, agricultural, and irrigating purposes on said reserve. Besides, stock raising, principally horses and cattle, has always been and is now extensively carried on by the Indians everywhere on the reserve. "The main reliance of these Indians for self-support is to be found in cattle raising." 29 Stat. 351, c. 398. And the stock ranging and feeding in the northern portion of the reserve all along the channel of the stream, from the eastern to the western limits of the reserve, must depend principally upon Milk river for drinking water. At the time of the institution of this suit no water reached any part of the reservation, the same having been diverted by the appellants.

Prior to the enactment of any law recognizing the right of appropriation to the waters on the public lands all of the country within the state of Montana was Indian country. By the provisions of article 4 of the treaty of October 17, 1855, proclaimed April 25, 1856, there was established and reserved to the Ft. Belknap Indians, and other Indian tribes, as and for their home and abiding place, nearly all that part of the state lying north of the Mussel Shell river, and extending from the crest of the main range of the Rocky Mountains eastward, approximately to what is now the western boundary line of the Ft. Peck Indian reservation. Revision of Indian Treaties, p. 7, 11 Stat. 658. By the terms and provisions of this treaty the Ft. Belknap Indians reserved to themselves the "uninterrupted privileges of hunting, fishing, and gathering fruit, grazing animals, curing meat, and dressing robes." Article 3 of Treaty, 11 Stat. 657. The territory which was so set apart and reserved to them at that time embraced the channel and the waters of Milk river from its source to its mouth lying within the confines of the United States. This continued to be the abode of these Indians until 1874, at which time their territory was reduced so as to embrace nearly all that part of Montana lying to the north of the Missouri river, and extending from the Rocky Mountains eastward to the Dakota boundary line, including Milk river. Act of April 15, 1874, c. 96, 18 Stat. 28. The tract so set apart remained Indian country and the Indian reservation of these Indians until 1888, at which time the present Ft. Belknap Indian reservation was carved out of the larger reserve established in 1874 as their "permanent home," with the center of Milk river as the northern boundary line of the reservation, and which is now its northern boundary line. The diversion of the waters by appellants is admitted by them, but they claim the right to divert the waters of Milk river on the ground that the waters of the stream in question were legally and properly appropriated by them and each of them for a beneficial and useful purpose, under the laws of the state of Montana authorizing the appropriation of the waters of the streams within that state for household, domestic, agricultural, irrigating, and other proper purposes as the same are sanctioned, recognized, and confirmed by the federal statutes. Their rights to the water are based upon the appropriation of the waters, and the rights relied upon and asserted by them are those, and those only, that inure to appropriators of water under state and federal laws.

The proofs show: That the individual appellants are owners of different quantities of land acquired by them under the desert land laws of the United States. That their title to a large portion of the lands was obtained from the government of the United States under said laws. Others had settled upon and applied to enter the land claimed by them under the desert land laws. Some of them had appropriated different quantities of water from the West Fork of Milk river, and others from the North Fork of Milk river, and all claim that at the time the waters were appropriated and diverted by them the lands along the bank of said stream above the point of said diversions were unappropriated public lands. Large amounts of money, exceeding over $100,000, had been expended by them in diverting the water and in making other improvements on their lands. The acquisition of their lands under the desert land laws, and appropriations of water, were made during the years 1895, 1900, and 1903. That in all said acts they relied upon the land laws of the United States, and upon the rights granted to appropriators of water, for the purpose of reclaiming desert lands; made entries under the land laws of the United States of the lands held by them, respectively, and diverted and appropriated the waters of the West Fork and North Fork of Milk river, outside of the limits of the Indian reservation, and the appropriations were made to be used upon lands which were thrown open to settlement upon the extinguishment of the rights of the Indians thereto. All of the lands owned or claimed by appellants, as well as the land owned by appellee and occupied by the Indians, under the treaty with the government, are dry and arid, and crops cannot be grown thereon without sufficient water to irrigate the same. Unless water is obtained, the lands and homes of the respective parties would be rendered valueless and useless.

There are four assignments of error: "(1) The said Circuit Court erred in holding that by the treaty made and entered into the 1st day of May, 1888, between the United States and the Indians residing upon the Ft. Belknap Indian reservation, there was reserved to the said Indians the right to the use of the waters of Milk river to an extent reasonably necessary to irrigate the lands included in the reserve created by the said treaty, and that by the said treaty there was reserved to the said Indians the right to the use of said waters at all. (2) The said Circuit Court erred in holding that the reservation of the waters of Milk river, if any, contained in the treaty of May 1, 1888, entered into by the United States, to the Indians residing upon the Ft. Belknap reservation, was binding upon respondents or any of them so as to affect the rights of the respondents to the use of the waters of the tributaries of said Milk river based upon .acts of appropriation done and had in pursuance to the laws of the United States, the laws of the state of Montana and decisions of its courts, and the customs of the country. (3) The said Circuit Court erred in holding that the rights of the Indians living upon said reservation to the use of the waters of Milk river were superior to the rights of the respondents or either of them, for the reason that the proof showed affirmatively and without contradiction that the respondents and each of them had diverted, appropriated, and applied to a useful purpose the waters of the said river or its tributaries, according to the laws of the United States, the laws of the state of Montana and decisions of its courts, and customs of the country to the extent claimed by them, and there was no proof showing that there had ever been an appropriation of the said waters according to the said laws, decisions, and customs of the said waters or any thereof according to the said laws, decisions, and customs by the said Indians, or on their behalf. (4) The said Circuit Court erred in holding that the Indians residing upon said reservation, or the United States for their use and benefit, were entitled as against these respondents or either of them to the prior right to the use of 5,000 inches of the .waters of Milk river, or to the prior right to the use of the said waters at all."

B. Platt Carpenter, E. C. Day, Stephen Carpenter, James A. Walsh, C. C. Newman, and R. E. O'Keefe, for appellants.

Carl Rasch, U. S. Atty., and Edward E. Cushman, Special Asst. Atty. Gen.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

The first, and in our opinion the most important, question to be determined in this case is in relation to the construction and true interpretation of the treaty of May 1, 1888, between the government of the United States and the Indian tribes therein mentioned. What rights, if any, did the Indians obtain by virtue of their consent to the terms of the treaty as ratified? The situation of the Indians and the rights held by them under the prior treaties must be considered. What were the inducements which caused them to give up their abiding places under the original conditions which existed, and to cede and relinquish to the government many of the rights and privileges which they had previously enjoyed? Their former homes and abiding places, their hunting grounds, and their rights of fishing in the streams and lands over which they roamed, were not voluntarily .abandoned, were not surrendered to the government without consideration, or without an object or purpose on their part. The territory over

which they previously had occupancy and dominion was very large. They were evidently induced by the commissioners representing the government to relinquish the greater· portion of the vast territory over which they claimed control and had possession by the promise of the government to aid them with money, and to furnish them with stock and farming implements whereby they could better their condition in life. The "act to ratify and confirm an agreement" with the several tribes of Indians in Montana, "and for other purposes" (Act May 1, 1888, c. 213, 25 Stat. 113, et seq.), of itself clearly specifies the causes which induced the Indians to make the change. "Whereas the reservation set apart by the act of Congress, approved April 15, 1874, for the use and occupancy" of the Indians named in the act, "is wholly out of proportion to the number of Indians occupying the same, and greatly in excess of their present or prospective wants, and whereas the said Indians are desirous of disposing of so much thereof as they do not require, in order to obtain the means and enable them to become self-supporting, as a pastoral and agricultural people, and to educate their children in the paths of civilization," the agreements were entered into. It was for that purpose, and other reasons mentioned in the different articles of the treaty, that the Indians ceded and relinquished to the United States "all their right, title and interest in and to all the lands embraced within the aforesaid * * * reservations, not herein specifically set apart and reserved as separate reservations for them, and do severally agree to accept and occupy the separate reservations to which they are herein assigned as their permanent homes." 25 Stat. 114, c. 213, art. 2. "In consideration of the foregoing cession and relinquishment, the United States hereby agrees to advance and expend annually, for the period of ten years after the ratification of this agreement," sums of money amounting to $430,000, "in the purchase of cows, bulls and other stock, goods, clothing, subsistence, agricultural and mechanical implements * * * in assisting the Indians to build houses and inclose their farms, and in any other respect to promote their civilization, comfort and improvement; provided, that in the employment of farmers, artisans and laborers, preference shall in all cases be given to Indians residing on the reservation who are well qualified for such position." 25 Stat. 114, c. 213, art. 3. "In order to encourage habits of industry, and reward labor, it is further understood and agreed, that in the giving out or distribution of cattle or other stock, goods, clothing, subsistence and agricultural implements, as provided for in article 3, preference shall be given to Indians who endeavor by honest labor to support themselves, and especially to those who in good faith undertake the cultivation of the soil, or engage in pastoral pursuits, as a means of obtaining a livelihood, and the distribution of these benefits shall be made from time to time, as shall best promote the objects specified."

In connection with the provisions and terms of the articles of the treaty to which we have specifically referred, attention is called to the boundaries of the Ft. Belknap reservation:

"Beginning at a point in the middle of the main channel of Milk river opposite the mouth of Snake creek, thence due south to a point * * * thence due east * * * thence following the southern crest of said mountains; * * * thence in a northerly direction in a direct line to a point in the middle of the main channel of Milk river opposite the mouth of Peoples creek; thence up Milk river, in the middle of the main channel thereof, to the place of beginning."

Now we have the basis from which to determine whether or not the Indians were, by the terms of the treaty, given any right on the reserve, which they accepted, to the flowing waters of Milk river from which to irrigate their lands, so as to enable them to cultivate the soil on the lands of the government set apart to them for the purposes mentioned in the treaty. The Indians are not the owners of the land included in the reservation. They are, however, occupants of the land which was by the government set apart and reserved for their occupation and use. The title to the lands is still in the government. The contention of appellants is that when Congress, under the treaty, declared the land to which the rights of the Indians had been extinguished to be a part of the public domain, the water of the river and other sources, unless expressly reserved, became subject to appropriation, under the terms of the Act Cong. March 3, 1877, c. 107, 19 Stat. 377, as amended March 3, 1891 (26 Stat. 1096, c. 561), and that the government did not reserve any right to the waters of Milk river which it or the Indians can assert against appellants, who appropriated the waters on the public domain, or to any of the water that flows through or past lands owned by the government.

To quote the language of counsel:

"The government, having the absolute title and right to dispose of all its lands, including the lands within the Ft. Belknap Indian reservation, had authority to grant the right of appropriating water upon those lands and upon the reservation. No reservation or restriction having been made, the government cannot now, after these defendants have accepted the grant, acquired vested rights and expended a large amount of money in improving their lands, enjoin them from using the waters which they have appropriated."

We are of opinion that, when all the facts, circumstances, conditions, and surroundings of the Indians at the time the treaty was entered into are considered, it cannot judicially be said that no portion of the waters of Milk river was reserved by the terms of the treaty for the use and benefit of the Indians residing upon the reservation. Such a construction would be in violation of the true intent and meaning of the terms of the treaty. We must presume that the government and the Indians, in agreeing to the terms of the treaty, acted in the utmost good faith toward each other; that they both understood its meaning, purpose, and object; that they knew that "the soil could not be cultivated" without the use of water to "irrigate the same." Why was the northern boundary of the reservation located "in the middle of Milk river" unless it was for the purpose of reserving the right to the Indians to the use of said water for irrigation, as well as for other purposes?

It is admitted by appellants that "the irrigation and cultivation of the Indian lands is a policy of the Indian department." The Indians

in their untutored and uneducated minds might not have known the exact meaning of the word "irrigation" had it been used in the treaty, but in their wild, and to some extent uncivilized, condition, they knew the use of forests, of lands, and of water. If they were to graze cattle and cultivate the soil, they knew it could not be done successfully without the use of water. They knew, as well as the officers of the government, where the boundaries of their reservation were, and that their rights, under the terms of the treaty, extended to the middle of the channel of Milk river, and believed they had as much right to the water as to the land included in the boundaries for their permanent homes for the uses and purposes of the agreement made with the government. The signing of the treaty was not an idle ceremony. The absence of the words "to irrigate their lands" did not abrogate and destroy their rights as guarantied by the terms of the treaty. We are of opinion that it was the intention of the treaty to reserve sufficient waters of Milk river, as was said by the court below, "to insure to the Indians the means wherewith to irrigate their farms," and that it was so understood by the respective parties to the treaty at the time it was signed.

It is true that in the treaty of June 10, 1896, c. 398, 29 Stat. 351, reference is made in article 5 to a scarcity of water which renders the pursuit of agriculture "difficult and uncertain," yet it will be observed that article 2 of that treaty appropriates certain sums of money for divers purposes, among others, "to enclose and irrigate their farms, and in such other ways as may best promote their civilization and improvement." In arriving at this conclusion we have followed the rules that should govern the courts in the construction of treaties made by the government with the Indians.

In Jones v. Meehan, 175 U. S. 1, 11, 20 Sup. Ct. 1, 5, 44 L. Ed. 49, the court said:

"In construing any treaty between the United States and an Indian tribe, it must always * * * be borne in mind that the negotiations for the treaty are conducted on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483; The Kansas Indians, 5 Wall. 737, 760, 18 L. Ed. 667; Choctaw Nation v. United States, 119 U. S. 1, 27, 28, 7 Sup. Ct. 75, 30 L. Ed. 306."

To accept the contention of appellants' counsel would certainly be, as was said by Mr. Justice McKenna in United States v. Winans, 198 U. S. 371, 380, 25 Sup. Ct. 662, 664, 49 L. Ed. 1089, "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the nation for more. And, we have said, we will construe a treaty with the Indians as 'that unlet-

tered people,' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' "

It is undoubtedly true, as claimed by appellants, that the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed, as to their effect, according to the law of the state in which the lands lie. It was so held in Hardin v. Jordan, 140 U. S. 371, 384, 11 Sup. Ct. 808, 838, 35 L. Ed. 428. See, also, Whitaker v. McBride, 197 U. S. 510, 512, 25 Sup. Ct. 530, 49 L. Ed. 857, and authorities there cited. It is also true, as appellants claim, that the desert land acts upon which they rely recognize the doctrine of appropriation of water under state laws, but this right of appropriation can only be acquired "subject to existing rights." The language of the proviso in the act of 1877 is:

"That the right to the use of water by the person so conducting the same, on or to any tract of desert land * * * shall depend upon bona fide prior appropriation * * * necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

The appropriations by appellants from the tributaries of Milk river were made with notice of, and subject to, the "existing rights" of the government and of the Indians on the reservation. Kinney on Irrigation, § 133. In Story v. Woolverton (Mont.) 78 Pac. 589, where the government had abandoned a military reservation and passed an act granting to the state of Montana a portion thereof, and there subsequently arose a question of water rights between the parties to the suit, the court, in discussing the statutory requirement governing the acquisition of water rights by appropriations made by individuals, said:

"Prior to the time of settlement upon the lands in question, and prior to the appropriation of the waters of Bear creek by any one, both the land and the water were the property of the government. When the government established the reservation, it owned both the land included therein and all the water running in the various nearby streams to which it had not yielded title. It was therefore unnecessary for the government to 'appropriate' the water. It owned it already. All it had to do was to take it and use it."

It necessarily follows from the conclusions we have reached as to the proper interpretation of the treaty that the appellants did not acquire any exclusive or superior right to all the waters of Milk river by virtue of the appropriation of said waters under Desert Land Act March 3, 1877, c. 107, 19 Stat. 377, as amended by Act March 3, 1891, 26 Stat. 1096, c. 561, 1 Supp. Rev. St. 137. The law is well settled that the doctrine of appropriation under said statutes, which is recognized and protected by section 2339 of the Revised Statutes [U. S. Comp. St. 1901, p. 1437], applies only to public lands and waters of the United States. Sturr v. Beck, 133 U. S. 541, 10 Sup. Ct. 350, 33 L. Ed. 761; Smith v. Denniff, 24 Mont. 20, 60 Pac. 398, 81

Am. St. Rep. 408; Cruse v. M'Cauley (C. C.) 96 Fed. 369, 373, 374. And it is equally well settled that, when the lands of the government have been legally appropriated or reserved for any purpose, they become severed from the public lands, and that no subsequent law or sale should be construed to embrace or operate upon them.

In Kinney on Irrigation, § 124, the author said:

"The term 'public domain,' in its broadest sense, comprehends. all lands and waters in the possession or ownership of the United States, and including lands owned by the several states, as distinguished from lands possessed by private individuals or corporations. The term 'public lands' only embodies such lands as are subject to the sale or other disposition by the United States under general laws. It is a well-settled principle that land once reserved by the government or appropriated for any special purpose ceases to be a part of the public lands, and in all grants or proclamations declaring public lands open to settlement the portion already reserved is always excepted, though the exception is not specifically mentioned."

In the application of these principles to military reservations, see Wilcox v. Jackson, 13 Pet. 498, 513, 10 L. Ed. 264. In Leavenworth R. R. Co. v. United States, 92 U. S. 733, 742, 745, 747, 23 L. Ed. 634, the court, in discussing the question whether certain lands granted to the railroad company conveyed lands which had previously been. reserved for the Indians, said:

"As long ago as the Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25, this court said that. the Indians are acknowledged to have the unquestionable right to the lands they occupy, until it shall be extinguished by a voluntary cession to the government; and recently, in United States v. Cook, 19 Wall. 591, 22 L. Ed. 210, that right was declared to be as sacred as the title of the United States to the fee. * * * With the ultimate fee vested in the United States, coupled with the exclusive privilege of buying. that right, the Indians were safe against intrusion,. if the government discharged its duty to them. * * * We are not without authority that the general words of this grant do not include an Indian reservation."

After quoting from Wilcox v. Jackson, supra, the court said that the rule therein announced "applies with more force to Indian than to military reservations. The latter are the absolute property of the government. In the former other rights are vested. Congress cannot be supposed to grant them by a subsequent law general in its terms. Specific language, leaving no room for doubt as to the legislative will, is required for such a purpose. * * * The treaty reserved them as much to one as to the other of the contracting parties. Both were interested therein, and had title thereto. In one sense they were reserved to the Indians; but, in another and broader sense, to the United States, for the use of the Indians. Every tract set apart for special uses is reserved to the government, to enable it to enforce them." In United States v. Carpenter, 111 U. S. 347, 349, 4 Sup. Ct. 435, 436, 28 L. Ed. 451, where the court held that the location of land scrip upon lands reserved for Indians under the provisions of a treaty with an Indian tribe, and the issue of a patent therefor, are void, Mr. Justice Field, in delivering the opinion of the court, said:

"It matters not whether the land had been surveyed or not, the treaty was notice that a part of the quarry would be retained by the government, and that the whole might be, for the use of the Indians. This purpose and the

stipulation of the United States could not be defeated by the action of any officers of the Land Department."

In Missouri, etc., Ry. Co. v. Roberts, 152 U. S. 114, 118, 14 Sup. Ct. 496, 498, 38 L. Ed. 377, the court, in discussing the general question, said:

"It has always been held that the occupancy of lands set apart by statute or treaty with them [the Indians] for their use cannot be disturbed by claimants under other grants of the government not indicating its intention, either in express terms or by the uses to which the lands are to be applied, to change the possession of the lands. And the setting apart by statute or treaty with them of lands for their occupancy is held to be of itself a withdrawal of their character as public lands."

In United States v. Rio Grande Irrigation Co., 174 U. S. 690, 702, 19 Sup. Ct. 770, 774, 43 L. Ed. 1136, the court, in considering the congressional legislation which recognizes and sanctions the right to appropriate water, and defines the operative effect of this legislation, and limits and confines it to the public lands, among other things, said:

"The unquestioned rule of the common law was that every riparian owner was entitled to the continued natural flow of the stream. [Quoting the language of Chancellor Kent, 3 Kent, Com. § 439.] While this is undoubted, and the rule obtains in those states in the Union which have simply adopted the common law, it is also true that as to every stream within its dominion a state may change this common-law rule and permit the appropriation of the flowing waters for such purposes as it deems wise. * * * Although this power of changing the common-law rule as to streams within its dominion undoubtedly belongs to each state, yet two limitations must be recognized: First. That, in the absence of specific authority from Congress, a state cannot by its legislation destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters, so far at least as may be necessary for the beneficial uses of the government property. Second. That it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States."

These rules are distinctly recognized and approved in the subsequent case of Gutierres v. Albuquerque Land Co., 188 U. S. 545, 554, 23 Sup. Ct. 338, 47 L. Ed. 588.

The views which we have expressed are conclusive upon the questions herein involved, and render it unnecessary for us to review the statutes and decisions of the courts of Montana upon the questions pertaining to the rights of appropriation, as distinguished from the rules of the common law as to riparian rights.

In conclusion, we are of opinion that the court below did not err in holding that, "when the Indians made the treaty granting rights to the United States, they reserved the right to use the waters of Milk river, at least to an extent reasonably necessary to irrigate their lands. The right so reserved continues to exist against the United States and its grantees, as well as against the state and its grantees."

The order appealed from is affirmed, with costs.