## UNITED STATES v. CONRAD INV. CO.

### (Circuit Court, D. Montana. August 5, 1907.)

### No. 720.

**1. INDIANS—RESERVATIONS—WATER COURSES—FLOW OF WATER—APPROPRIATION.**

An Indian reservation on public lands is property of the United States within the rule that the government, as the owner of lands bordering on a public stream, is of right entitled to the continued flow of the waters of such stream so far at least as may be necessary for the beneficial use of the property.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 28.]

**2. WATERS AND WATER COURSES—PUBLIC LANDS—APPROPRIATION OF WATER.**

Under Rev. St. § 2339 [U. S. Comp. St. 1901, p. 1437], as long as land belongs to the United States as a part of the public domain, the water flowing over the same in nonnavigable streams is subject to appropriation for the purposes recognized and acknowledged by the local laws, customs, or decisions of the courts, and the mere fact that a stream traversing such public lands may border at some point or for some space on a specific territory reserved by the government for some particular governmental use or purpose will not of itself destroy the public character of its waters, which remain subject to appropriation the same as though the reserve had not been created, unless by the creation thereof there was a consequent reservation of the waters also for use in connection therewith.

**3. INDIANS—INDIAN RESERVATION—WATERS.**

The creation by the government of an Indian reservation on the public lands bordering on a nonnavigable stream operates as a reservation of so much of the waters of such stream as may be required by the proper needs of the government for use on the reservation for the benefit of the Indians thereon; but any surplus remains subject to appropriation by others in accordance with the local laws and customs, and such right includes the right to erect necessary dams, although they may rest in part on the land of the reservation.

**4. SAME—BLACKFEET RESERVATION IN MONTANA—WATER RIGHTS.**

The Blackfeet Indian reservation was created by a convention with the Indians, as shown by Act May 1, 1888, c. 213, 25 Stat. 113–129, by which the land was assigned to them for their exclusive use and occupancy that they might be assured of permanent homes, and with the design that they should ultimately take allotments in severalty. The reservation is in part bounded by the center line of Birch creek, a considerable stream, and while a considerable part of the land is capable of being used for farming, it is arid, and requires irrigation. *Held*, that the creation of the reservation operated as a reservation of so much of the waters of the creek as might at any time in the future be required and could be utilized in carrying out the purposes of the treaty; that, so long as the government was administering the affairs of the Indians, it had the right to determine as an administrative question the quantity of water required and to take the same when and where it deemed necessary, the rights of any others to appropriate water being subject to such paramount right.

5. WATERS AND WATER COURSES—WATER RIGHTS OF UNITED STATES—ESTOP-
  PEL.
     The action of the.Secretary of the Interior or other departmental officer
  of the government in approving the maps of location of irrigation canals
  or ditches over public lands or reservations, as provided for by Act March
  3, 1891, c. 561, §§ 18, 19, 26 Stat. 1101, 1102 [U. S. Comp. St. 1901, pp.
  1570, 1571], cannot give the companies constructing the same any right
  to appropriate the waters of a stream, nor estop the United States to
  assert a priority of right thereto, where it exists, against either such com-
  panies or users who may be supplied by them.

6. SAME—SUIT BY UNITED STATES—PARTIES.
     Any invasion of the prior right of the United States to the waters of
  a stream is a trespass, and the government may maintain a suit in equity
  to protect its right against any one or all of such trespassers.

In Equity.

Carl Rasch, U. S. Atty.

T. J. Walsh and George H. Stanton, for defendant.

WOLVERTON, District Judge. The facts relevant and material
to an understanding of the issues involved by the present controversy
are, in brief, as follows: The Blackfeet Indian reservation, by its
present boundaries, was established by a convention with the Indians,
as shown by Act Cong. May 1, 1888, c. 213, 25 Stat. 113, 129. Birch
creek forms its southern and southeasternmost boundary; the line of
separation being in the center of the stream. This creek has its
source by several branches in the Rocky Mountains, and traverses pub-
lic lands of the United States before it touches the reserve, and empties
into the Marias river at the easternmost limit of the reserve. The Con-
rad Investment Company is a Montana corporation. In 1898 it began
the construction of an extensive irrigation system for the reclamation
and irrigation of lands in the county of Teton, in the state of Mon-
tana. The project contemplated the taking of water from Birch and
Dupuyer creeks, to be carried away for storage and distribution as the
demands might require. The company claims to have succeeded to
an appropriation of 19,350 inches of water from Birch creek, initiated
in 1897 by Thomas McGovern and his associates, and in right thereof,
as well as by its own initiation, to have appropriated 20,000 inches of
such water. At the time of the commencement of this suit it had con-
structed about 90 miles of the main channel and some 200 miles of
laterals, together with a reservoir of dimensions of 5½ miles in length
by a mile in width, with a depth of 35 feet, and storage capacity of
60,000 acre feet, adequate for the irrigation of 40,000 acres; the en-
tire system being sufficient for the irrigation of 60,000 acres of land.
The expense and outlay attending the enterprise was upwards of $100,-
000. As a means of diversion from Birch creek, the company con-
structed a dam across the stream, tying it to the bank upon the res-
ervation side. The dam was first constructed of brush, bound to-
gether in bundles, laid in the stream extending with the current, and
filled in with gravel and rock. Later, however, it was reconstructed, of
the same kind of material, with two tiers of piling driven across the
stream so as to hold the dam in place and render the structure more
substantial and durable. This later improvement was completed about

the 1st of August, 1904, and increased the height of the dam from 12 to 18 inches. By means of this structure the investment company was enabled to divert practically all the water in the stream except during the flood seasons. During the months of May and June, 1898, the government constructed a ditch out of Birch creek, on the reservation side. A little later the intake was carried further up stream, and so contrived that the water from the creek, when there was any therein, would flow into it without the necessity of a dam. The length of the ditch is about 5½ miles, and it discharges into what is known as Long Coulee; thence the water is carried into Blacktail creek, which latter stream intersects Birch creek some 12 miles below the head of the ditch. The flowing capacity of the ditch is estimated by Jenkins, the engineer who constructed it, at about 800 inches. Mr. Robinson, another witness for the government, says that in its present condition, it having become out of repair, its capacity is from 700 to 800 inches, but that under ordinary conditions it would carry 1,500 inches; that being the maximum. The defendant's witnesses differ widely from this estimate, and place the capacity of the ditch at approximately 250 inches; one witness extending it to 330. It is probable, from a survey of the entire testimony, that 800 inches is the nearer correct. It is in evidence that this ditch, with an extension that is practicable to be made across and beyond Blacktail creek, and suitable laterals, will cover from 9,000 to 10,000 acres of land upon the reservation susceptible of irrigation. The defendant's evidence tends to show that there are but 2,700 or 2,800 acres fit for irrigation under the ditch. This as it respects the conduit as now constructed. Such evidence shows, further, however, that there are from 8,000 to 10,000 acres of land upon the reservation susceptible to irrigation from Birch creek. This includes land lying above the head of the government ditch on the creek, as well as below the same as now extended. Six laterals have been taken out of the ditch, and used more or less by persons whose lands lie under it, for irrigating grasses, grains, and vegetables; grasses being in by far the larger proportion. These laterals have not been kept up uniformly, and not so much water is now being used through them for irrigation as formerly. They consist of the Cayton lateral, used at one time to irrigate some 30 acres; Cayton's place, consisting of 160 acres; the Teasdale or Ingram lateral, of size about 3½ feet in the clear at the base; the ranch in connection with which it is used, containing 200 acres. The Tatsey laterals, two of them, have been used for the irrigation of 100 acres, and are susceptible of distribution upon 400 or more. Tatsey is the owner of 160 acres, but in the occupancy of 640. Besides these, there are the Frank Pias and Mrs. John Hall laterals, one each to these persons. In addition to the government ditch with its laterals, four other ditches have been taken out of Birch creek upon the reservation, namely, the White Dog-Weatherwax, McKnight, Fisher, and Lon White ditches. These have a carrying capacity in the aggregate of 1,740 inches, and are presently so disposed as to irrigate more than 500 acres of land. There are inhabitants on the reservation side of the creek other than these mentioned, making an aggregate of 11 persons with their families. This by brief generalization of the testimony. The defendant's testimony will vary the

generalization somewhat. But let the amount of water diverted be more or less, or the amount of land susceptible of irrigation from such diversion be smaller or larger in area, we have a fairly definite idea of what can or might be done as it respects the irrigation from Birch creek of lands upon the reservation.

Much testimony has been directed to the dam at the head of the investment company's canal, for the purpose of indicating what amount of water was permitted to pass it and flow down the creek for use by persons desiring to irrigate their lands below. Some of the witnesses affirm that there was a considerable seepage from the dam, amounting to from 100 to 250 inches of water; while others testify that a large amount of water was allowed to run over the dam and continue its course down the stream. I think it is proven, however, by a survey of all the testimony, that the dam as constructed was sufficient to turn practically all the water in the stream at its ordinary stage. In the flood season, which occurs annually and lasts from two to four weeks, the dam overflows by a large volume, and the overflow continues down the course of the creek; but otherwise the water was mainly diverted by the canal. Seepage from the dam amounted to but little, and whatever there was of it was taken up by ditches upon the south side of the stream, of which there are several, so that the people upon the reservation secured but small, if any, benefit from it. The investment company could, by the regulation of its headgates, so raise the water in the stream as to allow it to flow over the dam in considerable quantities; but this was a regulation of which the company had complete control, and it assumed to divert the water or let it go down the stream as it pleased. By reason of its regulation, there was at times insufficient water running down the stream for use by the people upon the government side even for stock purposes, to say nothing of the irrigation that might have been carried on.

It is argued that there were some springs upon the government side that afforded abundant water for all stock and domestic purposes, and even for a limited irrigation. But in the last two years those springs, some, if not all of them, went dry, and the people were left without sufficient for their use. It is true that the last two years have been unusually dry, and there has been a dearth of water, as compared with former years. However, there has been at all times a large quantity of water flowing in Birch creek, abundant, if allowed to go down the stream, to have supplied all the wants and present needs of the people living upon the government side of the stream; but, as I have shown, it was cut off from them by the investment company's dam. Birch creek, at its lowest stages, carries about 2,500 inches of water; at its highest, a very large volume, amounting to 150,000 inches.

The primary question involved here, in my opinion, has been settled by the decision of the Circuit Court of Appeals for the Ninth Circuit, in the case of Winters v. United States, 143 Fed. 740, 74 C. C. A. 666. It was there determined, following the authority of the Supreme Court as announced in United States v. Rio Grande Irrigation Company, 174 U. S. 690, 702, 19 Sup. Ct. 770, 43 L. Ed. 1136, and Gutierres v. Albuquerque Land Co., 188 U. S. 545, 554, 23 Sup. Ct. 338, 47 L. Ed. 588, in effect that the United States, as owner of the lands—that is, such as

have been appropriated, set aside, or reserved for the government's use and benefit, bordering upon a public stream—is of right entitled to the continued flow of the waters of such stream, so far at least as may be necessary for the beneficial use of the government property. The Blackfeet Indian reservation is, in the sense defined, to all intents and purposes government property. The government has the legal title, and, while it may be said to hold the lands in trust for the Indians who are in the occupancy thereof for permanent homes (Act Cong. May 1, 1888, c. 213, 25 Stat. 113), yet it is their guardian and protector, and is bound by the policy it has adopted and long maintained towards them to conserve their rights and interests until released from guardianship; it being designed that eventually its release shall come through allotments in severalty in pursuance of the general allotment act of February 8, 1887 (24 Stat. 388, c. 119).

The next question in natural order needs elaboration. Local customs, regulations, and laws are paramount in determining the right to the diversion and use of water from public streams. Act Cong. July 26, 1866, c. 262, 14 Stat. 253 (section 2339, Rev. St. [U. S. Comp. St. 1901, p. 1437]), is in recognition of this, without intending to create any new, other, or different rights than such as existed at the time of its adoption. Atchison v. Peterson, 20 Wall. 507, 22 L. Ed. 414; Basey v. Gallagher, 20 Wall. 670, 22 L. Ed. 452; Broder v. Water Company, 101 U. S. 274, 25 L. Ed. 790. It is said: "The waters of flowing streams are publici juris—the gift of God to all his creatures." Mohl v. Lamar Canal Co. (C. C.) 128 Fed. 776, 778. And again that, the government being the proprietor and owner of the public lands, "it has the power to sell or dispose of any estate therein or any part thereof. The water in an innavigable stream flowing over the public domain is a part thereof, and the national government can sell or grant the same, or the use thereof, separate from the rest of the estate, under such conditions as may seem to it proper." Howell v. Johnson (C. C.) 89 Fed. 556, 558.

And so it has been held, referring to the statute of 1866, and the practical construction thereof has been, that as long as land belonged to the United States the water flowing over the same was subject to appropriation for any of the purposes named, when such appropriation was recognized by the local customs, laws, or decisions of the courts. Cruse v. McCauley (C. C.) 96 Fed. 369, 374. The lands here referred to as belonging to the United States, it is needless to add, are not such as have been previously spoken of as government property. They are the public lands open for settlement, occupancy, or purchase in some form or right. Now, it is a most natural sequence that the waters of a stream cannot lose their public character unless they are disposed of or reserved in some right or need by the general government, or the right to their use is acquired through local customs, laws, and regulations. The mere incident or circumstance therefore that a stream traversing the public lands of the country may border at some point, or for some space, a specific territory reserved by the government for some particular governmental use or purpose, would not of itself destroy the public character of its waters. They would be subject to appropriation the same as if the reserve had not been created,

unless by the creation thereof there was a consequent reservation of the waters also for use in connection therewith. The proposition is susceptible of illustration equivalent to demonstration. Take a reserve created for military purposes, bordered by a stream carrying a large volume of water, yet unnavigable; the need being limited to domestic, stock, and other small uses. It could not be said that the incident of the stream bordering the reserve affected the character of the waters flowing therein. If they were publici juris before the reserve was created, they remained publici juris thereafter, except as to such portion as was essential to the proper needs and use of the government upon the reserve. So it is of a reservation set aside for the exclusive occupancy of the Indians. The mere fact that a stream borders it in some portion of its contour does not relieve the waters thereof of the character of publici juris, if they were such prior to the creation of the reserve, except as to such portion thereof as the proper needs of the government may require for use upon the reservation for the benefit of the Indians. It follows therefore that, if there were any surplus waters of Birch creek over and above the needs of the government for the use of the Indians settled upon the Blackfeet Indian reservation, they were subject to diversion and appropriation by any person, association of persons, or corporation entitled to the benefits thereof under the local laws and customs and the acts of Congress pertaining thereto.

It would seem that, by virtue of the acts of Congress relative to the public lands, and the streams and waters incident thereto, namely: Act July 26, 1866, c. 262, 14 Stat. 253, being section 2339, Rev. St. [U. S. Comp. St. 1901, p. 1437]; Act March 3, 1877, c. 107, 19 Stat. 377 [U. S. Comp. St. 1901, p. 1548] relative to the reclamation of desert lands; sections 18, 19, and 20 of the amendatory act thereto (Act March 3, 1891, c. 561, 26 Stat. 1101, 1102 [U. S. Comp. St. 1901, pp. 1570, 1571]); and Act June 17, 1902, c. 1093, 32 Stat. 388 [U. S. Comp. St. Supp. 1905, p. 349], as construed by the Supreme Court, particularly in the opinion rendered in the case of Gutierres v. Albuquerque Land Co., supra—the defendant, the Conrad Investment Company, could rightfully divert water from streams coursing the public domain, and hence, in view of previous considerations herein, divert the surplus waters of Birch creek, for actual use for irrigation and other purposes. If it was entitled to do this, then it was entitled to do that which was reasonably necessary to effectuate the diversion, by the construction of a dam or other means of turning the water from its natural channel; and if, to this end, it was essential to extend the dam to the bank of the stream bordering the reservation, the right to do so would be but an incident of the right of diversion. So I conclude that, in itself, the construction by the defendant company of the dam to a conjunction with the reservation bank of Birch creek was not a trespass such as would entitle the government to an injunction restraining its maintenance.

I come then to inquire: What is the extent of the government's reservation of the waters of Birch creek for its needs and uses in behalf of the Indians in the occupancy of the Blackfeet reservation? And, subsidiary to this, is the further question as to the manner in which

the government may assert the rights that it possesses in and to such waters of a stream as it is entitled to.

By a reference to the treaty with these Indians, it will be seen that the reservation was assigned to them for their exclusive use and occupancy, and that they might be assured of permanent homes. The avowed purpose of the government was to encourage the Indians in habits of industry, and to induce them to engage in pastoral pursuits and the cultivation of the soil, in order that they might not only become self-supporting, but that they should eventually take on the habits and busy themselves with the enterprises of the civilized races. And, further, through the long-established policy of the general government, it was designed that eventually those Indians would come into individual allotments of these reservation lands, and occupy and own them in severalty, and that when the allotments were made the Indians should utilize them in the more approved manner of which they were susceptible. The lands being arid, the need of water is manifest, and so it must be considered that it was likewise designed that the Indians should have and enjoy the use of water in available streams wherever their needs might require. The Indian problem was and is, however, in a state of development. How well the government will eventually succeed in inducing these Indians to adopt the habits of a pastoral and agricultural people is not yet apparent. It has made progress with other tribes, and why may it not accomplish beneficial results in that line with these? We are informed by the present record that some of these Indians, and especially is this so of the half-bloods, are endeavoring to utilize the soil for grazing and agricultural purposes, and to that end are making use of the water available from streams for irrigation, that their products may be more abundant. And Major Dare, the agent in charge, tells us that about 90 per cent. of the Indians on the reservation have taken up separate settlements. This denotes progress in the way of the government's policy, and gives promise that its full hopes may yet be realized. Manifestly, the Indians cannot be expected to acquire water rights to any considerable extent through prior appropriation, because they are not far enough advanced in the art of agriculture to reduce the water to a continuous use, and the water of the public streams that they shall finally need depends largely upon their progress in this art. The government, however, being their guardian, has a most important trust to perform in this relation; that is, so to conserve the waters of such streams as traverse or border the reserve as to supply the Indians fully in their probable, or, I may say, even possible future needs, when they have ultimately secured their allotments in severalty. What these needs will be cannot be definitely determined. For the present, the matter is administrative in its detail. These Indians are now but the wards of the government. As it pertains to the lands which the government is holding in trust for them, it is administering them for their proper use and benefit, and in its administrative capacity it ought to be the judge of what amount of the waters of the streams adjacent to the reservation is or will eventually be essential for the needs of the Indians for use in connection with their lands.

The government has not to make a prior appropriation to enable it

to obtain the use of the water. It has only to take that which has been reserved or that which has never been subject to prior appropriation upon the public domain. It has only to come into its own when its needs may require—the Department of the Interior being the instrumentality by which it exercises that right and privilege—and all persons seeking appropriations from public streams must take subject to this paramount right.

It has been developed at the trial that from 8,000 to 10,000 acres of land upon the reserve is susceptible of irrigation from Birch creek. Of much of this the irrigation would be for grazing purposes, which would require less water than if employed for agriculture or the production of wild grasses for hay. Mr. Robinson, an engineer and a witness for the government, estimates that one inch of water is sufficient for the proper irrigation of 2½ acres. This appears to be the government's estimate ordinarily. Mr. Darling, an engineer also, and a witness for the defendant, estimates one-fourth of an inch to the acre, but concedes the government's estimate to be at the rate as stated by Robinson. The government has sought to divert 800 inches. Persons of Indian blood or the husbands of Indian women residing within the reserve have made other large diversions, aggregating possibly 1,740 inches, but have seemingly not applied the half of it; the area susceptible of being covered thereby, so far as the evidence would indicate, amounting to from 500 to 600 acres, possibly more. The government alleges that its diversion by means of the ditch and those made by the settlers amount in the aggregate to 2,000 cubic feet per minute, and that the whole of this amount is essential and necessary for the proper irrigation and reclamation of lands available and adjacent to said creek. There is a confusion arising from the bill putting its estimate upon the basis of cubic feet per minute, while the witnesses speak in inches. To bring the two together, I have made the following deduction: 2,000 cubic feet per minute is equivalent to 33⅓ second feet. Reducing this to inches, according to Mr. Newell's estimate of the ratio of inches to the second foot, which is done by multiplying by 50, we have 1,666⅔ inches. F. H. Newell's article on Irrigation, vol. 8, The Americana.

Although the bill contains other general allegations—that in order to promote the civilization and improvement of the tribes of Indians upon said reservation and to encourage habits of industry among them, and to make all the lands within the said reservation which are adapted and suitable to farming and ranching and the pursuits of agriculture susceptible to cultivation, all the waters of Birch creek will be needed—the testimony adduced does not bear them out, and the question recurs whether the government is now entitled to the amount of water which it alleges has been diverted. I am of the opinion that it is so entitled. It would need more according to the estimate of Mr. Darling, at the rate of one-fourth of an inch of water to the acre. According to the experience of water users in Southern California, however, the above amount of 1,666⅔ inches will be ample for the irrigation of 10,000 acres, if there should be that much contiguous to Birch creek on the reservation side. See Mr. Newell's article above cited. Especially do I think this is so for the present needs, considering that

much of the land will be irrigated for pasture only. What the needs may be in the course of time, or when allotments shall have been made, is a matter that cannot be determined from the present record, and I am of the opinion that it should be left to the Interior Department to determine that as the exigencies may arise.

It is argued by counsel for defendant that water can be brought over from Badger creek, a stream located 13 or 14 miles north of Birch creek, for irrigation of all the Birch creek lands. This, however, is a project of doubtful utility; but conceding that it could be successfully carried out, the government is not required to do so, when the waters of the latter stream are much more available, and are as much subject to use upon the reservation as those of Badger creek. The suggestion is clearly one of expediency, of which the Interior Department ought to be the sole judge, as it is a matter for its initiative, acting in its administrative capacity, in determining the occasion and the needs of the government pertaining to the waters flowing in the stream along and upon the reservation.

It is urged that the government ought to be estopped by its conduct to question the right of the investment company to divert from Birch creek the amount of water that it is claiming, the conduct ascribed consisting in the approval of the survey and plat of the canal traversing the public lands, as it does, and so laid as to take the larger volume of its water from Birch creek, by which it is claimed the government impliedly assented to the diversion; and that, the investment company having expended large sums of money in the construction of its canal, reservoir, and laterals, and many persons having settled in proximity thereto with a view to acquiring the use of water therefrom for irrigation and other purposes, the government ought not now to be heard to deny the rights which it encouraged the parties concerned to acquire at large expense.

Whatever right the investment company had to locate and construct its canal through the public lands and reservations of the United States was accorded by sections 18, 19, and 20 of the act of March 3, 1891, supra. Such a right is granted by these sections to any company formed for the purpose of irrigation, and duly organized under the laws of any state or territory, which shall have filed or may hereafter file with the Secretary of the Interior a copy of its articles of incorporation and due proofs of its organization; and it is provided that: "All maps of location shall be subject to the approval of the department of the government having jurisdiction of such reservation." This is but a regulation of statute, and the Secretary of the Interior acts in pursuance thereof. He has no power or authority to dispose of any of the waters of the public streams to private parties, nor can he bind the hands of the government by any acts of his looking to such a disposal. Hence his approval of maps of location as it relates to such a project bears with it the assent of the government that the project may go forward in the location and construction of canals, reservoirs, etc., over and across the public lands and reservations; but it can, by no rational canon of construction, carry with it a grant or the force of a permit to take any of the waters of the public streams. It is determined by other regulations altogether what waters may be

so taken, and they are limited to the surplus waters remaining after the needs of the government and the acquisitions of other prior appropriators are satisfied. So that in doing the act of approval the Honorable Secretary of the Interior does not estop the government in any way as it respects the diversion and use of water from the public streams. Nor is the government estopped by the further circumstance of settlers acquiring rights in the project for irrigation purposes. The settlers must necessarily take with full knowledge of the law, and all they can obtain in that relation as against the government is what the laws of Congress have given them the right to acquire. There can be no doubt of this construction of the statute invoked; but, if there were any, that construction would be adopted which is most advantageous to the interests of the government. Hannibal, etc., Railroad Co. v. Packet Co., 125 U. S. 260, 271, 8 Sup. Ct. 874, 31 L. Ed. 731. As to the power of the officers and agents of the government to bind it by estoppel, see United States v. Pine River Logging & Improvement Co., 89 Fed. 907, 32 C. C. A. 406; Pine River Logging Co. v. United States, 186 U. S. 279, 22 Sup. Ct. 920, 46 L. Ed. 1164.

Another question presented is whether complainant can maintain this proceeding without at the same time making all other appropriators and users of water from the same stream parties to the suit, that the correlative rights of all the parties to the use of such water may be settled and adjusted. I am of the opinion that it can. Any invasion of the government's right to the use of the water from said stream would give it cause for suit. And this would be so whether the shortage to the government was caused by one or several parties. All would be trespassers, and the government could sue some or all jointly, or any one of them severally, as it might feel disposed.

These considerations lead to a decree in favor of complainant. One will therefore be entered enjoining the defendant company from diverting any of the waters of Birch creek so as to impinge upon the right of the government to have flowing at all times in the stream the amount of 1,666⅔ inches; and the government will have leave to apply for a modification of this decree at any time that it may determine that its needs will be in excess of the amount of water so designated.