**SCHEER v. MOODY, and nine other cases.**
Nos. 527, 795–800, 804, 902, 903.

District Court, D. Montana.

March 9, 1931.

328

Thomas N. Marlowe, of Missoula, Mont., for plaintiff in Case No. 527.

E. E. Hershey and H. H. Parsons, both of Missoula, Mont., for plaintiffs in other cases.

Wellington D. Rankin, U. S. Atty., and Howard A. Johnson, Asst. U. S. Atty., both of Helena, Mont., and Benj. P. Harwood, Irr. Dist. Counsel, of Billings, Mont., for defendant.

BOURQUIN, District Judge.

These ten suits present like issues and are tried virtually as one. The pleadings are far from models, the answers scandalously verbose, but from them, opening statements, course of the trial, evidence, and arguments, the issues tried are as follows:

Plaintiffs are successors of allottees of lands of the Flathead Indian Reservation, to irrigate them claim private ditches and water rights, and also right to water from said project free from any its cost of construction. Defendant is manager of said project, denies the private rights, but concedes that of water from the project, provided charges assessed for construction be paid, obstructs the use of private ditches and water, assesses charges, interposes that his acts are in behalf of the United States and he immune from these suits, and that limitations have run even in favor of the United States against its wards, plaintiffs' predecessors in title.

The relief sought is injunction against defendant's interference and assessments, and that plaintiffs' titles be cleared and confirmed. The defense is by government counsel, the district attorney also appearing as amicus curiæ, but abandoning that character, he is active in behalf of the defendant.

Some of "history" and of "policy" to which the parties appeal are material, and all, interesting—parts of the humiliating record of our oppression, expropriation, dispersion, and destruction of the Indian nations which formerly exercised dominion over all this broad land. To recall no more than necessary, however, for time immemorial and in 1855, the Flathead and other Indians, many, many thousands, free, content, and happy, were natural owners, occupants, and overlords of all the vast domain west of the Continental Divide and within what is now Montana. Rich and lovely as that region was and is, as always, it excited white avarice and intrigue to oust the red; as always, the alibi, uplift, and civilization. Thereupon was invoked the established policy, "buy when you can,—cheap, fight when you must," and in behalf of the United States Isaac I. Stevens negotiated a "treaty" with some eighteen Indians styled "chiefs, headmen, and delegates of the confederated tribes." 12 Stat. 975.

To promote a favorable atmosphere, Stevens gave to the few Indians assembled a small quantity of brilliant beads, gaudy calicoes, and other gewgaws of the "trade goods" of the time, and to insure the chiefs' complacency promised each of them $500 yearly for 20 years, house, furniture, and garden. And for the Indian thousands were to be expended, $120,000 apportioned over a series of years.

In consideration thereof the delegates, like another Esau, assumed to convey to the United States all this extensive empire, their tribal birthright, save about one-eighth reserved for continued use by the Indians, cribbed, cabined, and confined. Natural advantages and intrinsic values taken into account, the deal cast into the shade Manhattan's famous bargain. This treaty and reservation had many counterparts the country over, and even as Ahab the vineyard of Naboth, the whites exceedingly coveted these fragments of Indian empire. Their appetite grew by what it fed upon. Accordingly, and as always, the indefatigable lobby besieged Congress, which as often capitulated, with sequelæ as follows: Our Indian policy had so far attained its objective by 1871, that it was enacted (16 Stat. 566) that the independence of Indian nations would no longer be recognized, and their right to treaty was repudiated.

The Act of Feb. 8, 1887 (24 Stat. 388),

authorized the President to compulsorily allot limited acreage of reservations to individual Indians, to whom, after a trust period, would issue patent in fee "free of all charge or incumbrance whatsoever," (section 5 [25 USCA § 348]), and to negotiate the purchase of the excess lands; and likewise the Secretary of the Interior to prescribe rules for just distribution to Indians of water for irrigation. The care-free rovers of forests and plains were perforce to be transformed into toiling agriculturists, and yielding to the inevitable, these unfortunate peoples sought to accommodate themselves to bureaucratic fashioning. Even prior to the Act of 1887 as well as thereafter, the Indians constructed ditches and applied water to the land, on this reservation as on others.

In 1904 the President having failed to act, but not so the lobby, it was enacted (33 Stat. 302) that these lands be allotted in accordance with the Act of 1887, and the excess lands sold at prices fixed by a commission of five, two of whom would be of "tribal relations" though not necessarily Indians, and the proceeds devoted (1) to pay expenses, (2) one half any excess to be expended for irrigation ditches etc. for the Indians, and (3) the other half to be held by the United States as trustee until to the Indians delivered. By amendment in 1906 (34 Stat. 355), the Act of 1904 was not to be taken to deprive any Indian "of the use of water appropriated and used" by him, or of any ditch by him constructed.

In 1908 the rather state socialistic policy of governmental irrigation of private as well as public lands, initiated in 1902 (32 Stat. 388), had not yet demonstrated its startling possibilities [see Donohoe's Case (D. C.) 33 F.(2d) 362], and the ambition other desert worlds to conquer inspired an Act of May 29, 1908 (35 Stat. 450) amending the Act of 1904 and providing for the project in suit to irrigate white as well as Indian lands, the cost to be paid with proceeds of sales of excess lands and including the trust fund created by the Act of 1904, the purchasers of excess lands to some time pay a due proportion of the cost, but Indians to have right to water without costs for construction, and likewise any of their vendees during the trust period, to the time of purchase.

Later in 1908 all the lands in suit were allotted to Indians, trust patents issued, and thereafter fee patents and conveyances to plaintiffs. At the time of allotment and thereafter, but prior to subsequent legislation wherein the government sought to renege in respect to assumed overliberal provision for irrigation water for Indians, the allottees had constructed ditches to and upon these lands, and in their irrigation had appropriated and used the waters claimed by plaintiffs, with the secretary's sanction and aid; and therein they and their vendees continued without question of their right and title until defendant's interference in 1917, from which time he required that they, as some perforce did, apply to him and pay for water.

In 1909 construction began and yet continues in fashion of governmental business ventures, promises indefinite if not permanent prolongation, and the cost or that charged at least is $65 per acre, the limit unless landowners consent to more, to be reimbursed to the government over a period of 65 years, without interest, equivalent to present cancellation of 75 per cent. of the principal of the debt.

Incidentally, although this irrigation adventure is one aspect of that state socialism which, like it or not, is the trend of the times, none the less the West having profited, however much it abuses sound principles and costs government (and that's a plenty), are human enough to rejoice in its local benefits and to hope even more of the landowners' debt be canceled, at least before are any more of the European debts.

By 1914 was a sorrowful awakening to the fact that the proceeds of excess lands were woefully inadequate to liquidate surprisingly mounting expenditures upon this project, and this inspired the act of that year (38 Stat. 583) providing that not tribal funds but the public treasury would bear the burden, and Indians too would pay for construction costs to be assessed against them, in proportion to benefits by them received. In natural course followed the Act of 1916 (39 Stat. 140, 141), which not only assesses construction costs against the lands of Indians, but provides that purchasers during the trust period would be exempt from only so much of construction costs as had "accrued" and was due in accordance with notice by the secretary—a wide opening for strategy.

For some 20 years defendant was manager of the project and until 1917 refrained from interference with these private water rights, in their exercise even permitting use of the project ditches which conflicted with the private ditches. In respect to all plaintiffs save one, defendant assesses costs of construction. Some of the fee patents declare liens for said costs, and some issued to al-

lottees' vendees on condition they pay all assessments therefor.

The trust period by the Act of 1887 was fixed at 25 years. For those desirous to acquire the choicest of the lands allotted to Indians, this was altogether too long; and covetousness again inspired an act, that of 1906 (34 Stat. 182 [25 USCA § 349]), authorizing the secretary forthwith to issue fee patent when "satisfied" of the Indian's ability to manage his own affairs, whereupon alienation is unrestricted. Even as the reasons, the effects are obvious, and it is surprising how fast the Indians develop that ability or at least interested parties satisfy the secretary they have; for they are being rapidly separated from their lands, and however necessary to better the record and save the face of reservation projects, the erstwhile Indian owners are hopelessly cast adrift on a strange competitive sea which threatens their wreck upon the reefs of pauperism—the evil climax of a worse policy applied to a dependent and unhappy people.

Upon this project, however, the land allotted to the Indian to-day may be sold by him to-morrow, the secretary consenting, whether or not the allottee possess the ability aforesaid, which accentuates the evil. The plaintiffs are purchasers of allotted lands, and in the main stand in the shoes of their Indian predecessors in title. Of little value without water for irrigation, the worth of the lands is greatly enhanced by a sufficient supply of that essential commodity, which in general is one inch per acre.

█ It thus appears plaintiffs claim two water rights: First, private ditches and water free from project control and charges; second, project water without cost save for maintenance and operation. In either case, any such right is limited to water in equality with all other like users and to the extent reasonably necessary. Whether resort be had to one or both rights, the limit of use is reasonable necessity. Adverting to the claim of private ditches and water rights, if established, defendant has no control over them, and his interference with plaintiffs' enjoyment of them is mere trespass for which he must personally account and for which his employment is no defense. Unless justified by some constitutional statute, a governmental officer or employee acts at his peril and personally pays for his wrongs—a salutary principle necessary to discourage abuse of power, that official power which the great Marshall declared would be abused wherever authority was reposed. And suits against any such trespasser are not against the government, these suits, not against the United States. Rather do they serve the United States to discipline its derelict agent whose excesses tend to defeat its obligations and to bring it into disrepute. See Sloan v. Corp., 258 U. S. 566, 42 S. Ct. 386, 66 L. Ed. 762; U. S. v. Lee, 106 U. S. 220, 1 S. Ct. 240, 27 L. Ed. 171; Philadelphia v. Stimson, 223 U. S. 620, 32 S. Ct. 340, 56 L. Ed. 570; Stanley v. Schawlby, 147 U. S. 518, 13 S. Ct. 418, 37 L. Ed. 259; Magruder v. Belle Fourche Valley Water Users' Ass'n (C. C. A.) 219 F. 72, 78. Whether by reason of contracts involved the plaintiffs might sue the United States, or the latter intervene, is not before the court.

█ That these ditches and water rights are private property is clear. The ditches were built by and for Indians and for the lands in suit, and the water by these ditches conveyed was upon these lands used. Thus appropriated, ditches and water rights became appurtenant to the Indians' allotments, and like the allotments themselves, their property in severalty. And as such, they could as they did convey them to plaintiffs. Not only did necessity, custom, and usage of the country, applicable to Indians as to whites, sanction these appropriations, but the statute of 1887 authorized them, and the statute of 1906 recognized and confirmed the Indians' titles were that necessary.

To whatever extent the United States expended money in construction of these particular ditches, it was of the ordinary appropriations in support of a people whose original sources of livelihood had by government been appropriated, and whether to pay a debt, or to appease uneasy conscience, was not to be reimbursed. It was an executed gift at least, and as such never questioned, until the present attempt to impose this gift of near 40 years ago as part of the construction costs of the project and in part assessed against these very plaintiffs though their right to the ditches is denied. But that too might better the appearances of the project's finances.

Though the character of the money so expended be immaterial, it is worthy of note that plaintiffs' requests for certified copies of departmental records to disclose its sources were denied unless the court would certify needed. This, the court refused to do, adhering to Carson's Case (D. C.) 14 F.(2d) 559, and declining to sanction abuse and flatter the ego of power. Significantly enough, without any such certificate the defendant

at trial turned up in possession of all thereof assumed necessary to serve his defense.

The employee of the United States is given an unfair advantage over plaintiffs. And yet it is a fundamental principle that in court and before the law all are equal, the humblest with the greatest or even with government itself. That this is more observed in theory than in practice, however, was declared by Cato some 2,000 years ago, and of frequent advertence as a modern instance now historical, are the notorious "whispering wires" or Olmstead Cases (see 276 U. S. 609, 48 S. Ct. 207, 72 L. Ed. 729; 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944, 66 A. L. R. 376), wherein the humble petitions for review of individuals deprived of liberty were twice denied, but later granted—it is said at the instance of the telephone corporation in behalf of its property assumed to be involved; and, believe it or not, the review was strictly limited to the telephone issue.

█ Immaterial is it also whether or not the allottees' appropriation of the waters was pursuant to rules by the secretary prescribed as authorized by the Act of 1887 aforesaid. The statute vests discretion in the secretary, is not mandatory, and is intended to restrict the recognized right of appropriation only so far as in the judgment of the secretary its exercise in absence of controlling rules would work injustice. Rules or not, the Indians' necessities were as great, their right to appropriate water no less, save to the extent exercised inequitably. And as before noted, the Indians' appropriations of water were known to, sanctioned by, and acquiesced in by the secretary, more effective than any of his rules and for which he perceived no necessity.

In the matter of project water, the treaty assured to the Indians right of occupancy of the reservation forever. Congress, however, in disregard of the treaty, and by the Act of 1904 as amended by that of 1908, arbitrarily allotted to them portions of the reserved lands and deprived them of the excess. By way of consolation, if not compensation, Congress agreed to construct an irrigation system with proceeds of the excess lands, from which the Indian allottees would have right to water necessary to irrigate their allotted lands "without cost for construction," and their vendees during the trust period, like use without costs "incurred up to the time of purchase." It is obvious that this exemption was not a pure gratuity, for construction was to be paid from tribal funds.

█ Nevertheless it created valuable rights in behalf of Indians and their vendees, assuring the Indian a home capable of supporting him, without any personal liability or lien on his land, and potentially of greatly increased sales value. This right is property, within the protection of the Fifth Amendment, and beyond impairment by the Acts of 1914 and 1916 which assume to destroy it. It will not do to say that the Indians paying the cost of the project in any event, the later legislation is merely an administrative change in the Indians' funds made liable. For a tribal liability is as distinct from an individual liability and lien, as night from day. Congress controls the former but cannot the latter. Granting that the project could have been abandoned without completion when tribal funds were dissipated and failed, it is clear it could not proceed in divestiture of the rights aforesaid, the Indians "improved" out of their homes, crushed by an enormous debt imposed upon them individually and upon their lands held in severalty. See Choate v. Trapp, 224 U. S. 665, 32 S. Ct. 565, 56 L. Ed. 941.

█ An allotment made and "trust patent" issued, the latter equivalent to a receiver's receipt, the right to water attached, the Indian is vested with the equitable title to the land and water right, the United States holds the land in trust for him to convey to him the fee clear of all charges and incumbrances when the trust period has expired. And although as guardian and administrator the United States may legislate to meet changed conditions affecting allotments, its authority does not extend to violate any fundamental right of allottees therein, to impair vested property rights without due process. See U. S. v. Rickert, 188 U. S. 436, 23 S. Ct. 478, 47 L. Ed. 532; U. S. v. Rowell, 243 U. S. 469, 470, 37 S. Ct. 425, 61 L. Ed. 848; Duncan v. Lane, 245 U. S. 310, 38 S. Ct. 99, 62 L. Ed. 309; U. S. v. Jackson, 280 U. S. 191, 50 S. Ct. 143, 74 L. Ed. 361. So that, however the project is completed, the Indian allottees are entitled to water "without cost for construction," as the statute of 1908 granted to them, and likewise their vendees save as hereinafter indicated.

█ There is no warrant for claim of lien in and by the patents. No statute authorizes it. It is a nullity. That some of plaintiffs agreed to pay the liens and assessments thus reserved does not estop them to dispute their validity. For the instruments containing the covenant, read as always in the light of the law, disclose the truth that in fact and law the lands are not subject to any such charge. In so far, however, as

Congress imposed conditions upon the purchase of the Indian allotments, they are valid. It can restrict alienation, forbid it altogether, and so can attach reasonable conditions which the vendee must perform.

Hence, to the extent that allotted lands are benefited by the project system, purchasers thereof during the trust period and prior to the act of 1916 are liable for costs of construction save those "incurred up to the time of such purchase," as provided by the act of 1908, and, like purchasers during said period but subsequent to the act of 1916, are liable for such costs save those which at purchase had "accrued and become due in accordance with the public notices," as provided in the said act of 1916. And assessments therefor can rightfully be made by defendant against any such purchaser. No doubt the liability was taken into account in fixing the purchase price paid, and though it impaired the sales value and the Indian's constitutional right, and whether or not the government will account for it to the Indian whose returns were thus diminished, are no concern of the purchaser.

In the matter of limitations, it is a defense as mean as it is invalid, so far as urged in behalf of the United States against its Indian wards, plaintiffs' predecessors in title. After the allottees' titles passed to persons not wards of the government, the owners were subject thereto. Respecting the private ditches and water rights, the proof fails to establish that for 10 years continuously after the title to the allotted lands, to which they were appurtenant, passed from Indian wards to plaintiffs or other persons not wards, and before these suits commenced, (1) any owners of the lands had continuous need of and desired to use any particular amount of said waters upon the land; (2) any their use thereof was continuously prevented by defendant; (3) at the same time the said water by defendant continuously applied to beneficial use. That plaintiffs sometimes needed and desired to use some water for some of the land is not enough; that defendant sometimes denied plaintiffs' right, claimed for his employer, sometimes, some part obstructed, is not enough; that he for ten years continuously and completely prevented plaintiffs' need and desire for all the water would not be enough. For the only right and title to water is necessary and beneficial use, and there is no possession of it which will transfer right and title to one claiming adversely, save like necessary and beneficial use duly exercised. In its absence,

denials, claims, obstruction of ditches, diversion of the water to useless onward flow, and the like, are mere trespasses without effect upon right or title. Likewise in the matter of plaintiffs' right to project water, the proof of limitations fails. In fact, their right thereto has never been denied though seldom exercised. That sometimes defendant included construction costs other than those to which purchasers are liable as hereinbefore noted, in bills to plaintiffs, also to Indians who are liable to none, goes for nothing save illustration of official lawlessness, harassment, victimization, and oppression of a necessitous people. In view of the premises, further consideration with reference to particular cases can be brief.

In No. 527, it appears that in 1895 one McLeod and family of the Flatheads occupied 400 acres of the reservation lands for allotments subsequently made, and then timely constructed ditches and used and so appropriated for irrigation, 400 inches of the waters of Crow creek. After fee patent issued and in 1918, one of the allottees thereof sold and conveyed the 40 acres and appurtenant water right involved, to plaintiff.

There is no real conflict in the evidence that before project initiated, 35 of these 40 acres were susceptible of and were irrigated from McLeod's ditch. That in 1914 government agents observed no ditches upon the land is consistent with prior thorough irrigation. In farming, perhaps irrigating by flooding, any small distributing ditches have little permanency and tend to soon disappear. Recently a local irrigation district has contracted with the United States that it will assess and collect all costs of the project by the Secretary computed.

Accordingly, the only relief due is injunction in respect (1) to the private ditch and water to the extent of 35 inches beneficially used by plaintiff, (2) to beneficial use of project water required, and (3) costs. A purchaser subsequent to fee patent, Congress imposed no costs of construction, and so, plaintiff is liable for none. The reason no costs on such purchasers is that Congress had in mind a trust period of 25 years, and a project completed and paid for before lapse of that time. It totally forgot that a too easily satisfied secretary might cut short the period; it wholly failed to foresee the success with which government projects of the kind can be well-nigh interminably drawn out; and it overlooked the "joker" in the Act of 1908 which sanctions immediate sale by allottees, regardless of any trust period.

In Nos. 795, 796, 799, 800, and 902, in the early 1890's the Indians in occupancy of the lands for allotments in 1908 made, constructed, and maintained a ditch from Finley creek which carried its waters in sufficient quantity to irrigate the lands and which were so used as desired until defendant's interference in 1917. Some years prior to 1917 the project ditch was for some 1,000 feet substituted for the Indians' ditch to that extent filled by the former. That the lands needed the conventional inch per acre and were supplied therewith, save 40 acres in No. 799, is clearly proven. Indeed, defendant's evidence includes the findings of a "commission" of 1914 that these lands were so irrigated.

In different years, from 1911 to 1929, the allottees parted with title, in part before fee patent issued, in part after, and then or thereafter plaintiffs acquired them. This ditch supplied other allotments, but defendant a trespasser unconnected with their titles, no consideration need be given to the point by him urged that the evidence does not disclose how much water would be available for plaintiffs, did the others aforesaid require any. In any event, against him, plaintiffs are entitled to nonmolestation to the full extent of their necessities; hence, to injunction restraining defendant from interference with use of the private ditch and water in amount aforesaid, with use of project water, from assessment of costs of project construction against them and their lands save as hereinbefore indicated, and costs.

In Nos. 797, 798, and 903, the ditch involved is out of the Jocko river, and was constructed in 1886 and shortly thereafter, to supply the needs of Indians then later settled below it upon lands including these in suit to the Indians allotted in 1908, and from whom plaintiffs deraign title. Before the initiation of the project in 1909, these lands required, and now do require, one inch of water per acre, and had been irrigated by the allottees as follows: No. 797, 26 acres of the Ursula McLeod allotment, 40 acres of the Caroline McLeod allotment, and 40 acres of the Louise Moise allotment; No. 798, 40 acres of the Catherine Finley allotment; and No. 903, 60 acres.

The evidence of Indian witnesses to events so many years ago is difficult, but is believed sufficient to establish at least so many acres thus irrigated from this old Indian ditch. This ditch, too, supplied other allotments; but, as before, the absence of evidence whether the use of its water upon these lands to the extent aforesaid infringes the rights of other allottees owners therein, is of no avail to defendant.

Plaintiffs are entitled to relief as in the five suits aforesaid.

In No. 804, the government recognizes the private right claimed to the extent of 50.4 acres of the 250 acres involved, and since as elsewhere its ditches incorporate or destroy the private ditches, from its ditches it delivers so much water to plaintiff. The allottees of these lands, plaintiff's predecessors, had constructed ditches in the 80's to convey the waters of Agency creek to irrigate some of the lands, and had also availed themselves of the Indian ditch from Finley creek mentioned in the five cases aforesaid. The evidence warrants the finding that before the inception of the project they had applied the waters from these ditches in necessary irrigation of one inch per acre, to 19 acres of the Mary Finley allotment, 20 acres of the Mary Michel allotment, and at least 34.2 acres of the White Coyote allotment. It would seem the ditches would carry more water, but the extent of the use is the measure of the right, when dilatory application has been interrupted by the government's intervening appropriation as here.

Relief is awarded as in the five cases aforesaid.

Decrees accordingly.

Counsel will present brief findings of ultimate facts so far as in issue, and not mere evidence.