## UNITED STATES v. WIGHTMAN.

### (District Court, D. Arizona. January 11, 1916.)

### No. E-1.

1. INDIANS ⬩10—RIGHTS IN LANDS OF RESERVATION.

   The right which Indians hold in the lands embraced within a reservation is that of occupancy, the fee and the right of disposition being in the United States.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 25, 29, 46; Dec. Dig. ⬩10.]

2. INDIANS ⬩12—RESERVATIONS—WATER RIGHTS.

   The creation of an Indian reservation does not vest the Indians with the right to the use of the waters thereon, except so far as necessary to carry out the object for which the reservation was created.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 27, 28; Dec. Dig. ⬩12.]

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. INDIANS ⬤⇒12—RESERVATIONS—WATER RIGHTS.

On the abandonment of a military reservation, a part was added to an existing Indian reservation, and the remainder was opened to settlement and the lands sold. Some 400 to 600 feet within the new boundary of the Indian reservation were certain springs, the water from which had been used for the purposes of the military post, including the irrigation of land thereon, no part of which, however, was within such boundary, and when such land was appraised for sale the water rights were taken into consideration. But about 15 acres of the land on the reservation could be irrigated from the springs. *Held*, that the purchasers of the irrigated lands had a right to the use of the water superior to that of the Indians.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 27, 28; Dec. Dig. ⬤⇒12.]

In Equity. Suit by the United States against Rollo Wightman. Decree for defendant.

Thomas A. Flynn, U. S. Atty., of Phœnix, Ariz., and Samuel L. Pattee and Wm. J. Bryan, Jr., Asst. U. S. Attys., both of Tucson, Ariz.

L. L. Henry, of Globe, Ariz., and John H. Campbell, of Tucson, Ariz., for defendant.

SAWTELLE, District Judge. This case was submitted to the court upon a statement of facts agreed by the parties, or case stated, upon which the court was to render such judgment as the law requires upon the facts stated, leaving no questions of fact to be tried, and presenting nothing but questions of law. The statement is as follows:

This action is brought by the United States, acting through the United States attorney for the district of Arizona, by direction of the Attorney General of the United States, and is brought in behalf of the United States and the Indians residing upon the San Carlos Indian reservation in Arizona.

On the 9th day of November, 1871, a tract of land, the property of the United States, was by executive order reserved and set apart by the United States as an Indian reservation as and for a permanent home and abiding place of the Apache and other bands and tribes of Indians, in the then territory of Arizona, and designated as the White Mountain Indian reservation, situate and being in the then territory of Arizona, the boundaries of which reservation, including a certain tract of land subsequently reserved and set aside by an executive order and added to said reservation and made a part thereof, and designated as the San Carlos division of the White Mountain Indian reservation, were fixed and defined as hereinafter set forth.

That thereafter, to wit, on the 14th day of December, 1872, a tract of land situate and being in the then territory of Arizona and the property of the United States was reserved and set apart by executive order and added to and made a part of said White Mountain Indian reservation, and known and designated as the San Carlos division of the White Mountain Indian reservation, the entire boundaries of which said White Mountain Indian reservation, including the said San Carlos division of the said White Mountain Indian reservation, so as aforesaid added to and made a part of said White Mountain Indian reservation were fixed and defined as follows, to wit:

Starting at the point of intersection of the boundary between New Mexico and Arizona with the southern edge of the Black Mesa, and following the southern edge of the Black Mesa to a point due north of Sombrero or Plumoso Butte; thence due south to said Sombrero or Plumoso Butte; thence in a direction by Piache, Colo., to the crest of the Apache Mountains, following the said crest down the Salt river to Pinal creek, to the top of the Pinal Mountains; thence due south to a point 15 miles south of the Gila river; thence east with a line parallel with and 15 miles south of the Gila river to the

boundary of New Mexico; thence north along said boundary line to the intersection with the southern edge of the Black Mesa, the place of beginning.

That said tract of land is now and ever since said last-mentioned date has been used as an Indian reservation, and as the home and abiding place of said Indians, saving and excepting certain parcels thereof that from time to time have been set apart under authority of the United States for other purposes; but that said parcels so set aside did not include any part of the land upon which is located the springs hereinafter referred to as Goodwin Springs, or any part of the land hereinafter described as being within said reservation and susceptible to irrigation from said springs.

That in and upon said reservation, and upon which, if surveyed, would be in approximately the S. W. ¼ of the N. E. ¼ and the N. W. ¼ of the S. E. ¼ of section 26, township 4 S., range 22 E., G. & S. R. B. & M., and within the boundaries of said reservation, a number of springs of water, commonly known as Goodwin Springs, rise to the surface, from which springs there is a constant flow of water in large and substantial quantities, though the amount of such flow varies from time to time according to the season. Said springs are situated variously from 400 to 600 feet from the eastern boundary of said reservation, and the surface ground surrounding said springs is such that the natural flow of the waters arising from said springs is toward the easterly boundary line of said reservation, all of the waters therefrom flowing to and upon and over lands adjoining the said reservation, to wit: Lots Nos. 1, 4, and 5 of section 26, and lot No. 3 and the N. W. ¼ of the N. W. ¼ of section 25, township 4 S., range 22 E., G. & S. R. B. & M.

That large portions of the land embraced within the boundaries of said Indian reservation are well fitted and adapted for pasturage, and the feeding and grazing of stock, and since the establishing of the said reservation, and long prior to the acts of the defendant complained of in this action, the United States and the said Indians have had and still have large numbers of cattle and horses grazing upon the lands within said reservation, being and situate along and bordering upon the said Goodwin Springs, and some of the waters of the said springs were used by the plaintiff and the Indians aforesaid for watering of horses and cattle.

That other portions of the land within said reservation, and bordering on and adjacent to said Goodwin Springs, are arable and irrigable, and adapted to and susceptible of farming and cultivation and the pursuit of agriculture, and productive in the raising thereon of grass, grain, and vegetables, but that such portions are of dry and arid character, and in order to make them productive large quantities of water are required for their irrigation.

That the lands surrounding said Goodwin Springs within said Indian reservation, which are susceptible to irrigation from said springs, had never been, prior to the commencement of this suit, in cultivation by means of water from said springs, except during the period when this land was occupied by the United States military forces in like manner as referred to herein. About 15 acres of land within said reservation are susceptible of cultivation and irrigation by means of the water from said springs.

That Indians living on said reservation have had and still have cattle and horses grazing upon said lands and within said reservation, being situate and bordering upon the said Goodwin Springs, and that the waters of said springs were used by the plaintiff and the Indians aforesaid for the watering of said cattle and horses, and said cattle and horses of the said Indians now water, and in all times in the past have watered, at said springs.

That for many years prior to the year 1872 the said lands upon which the said springs are situated, and the lands hereinafter described as being lands belonging to the defendant, were within a certain military reservation of the United States, known and designated as Camp or Ft. Goodwin military reservation; that in or about the year 1872 the said lands upon which the said springs are situated were, by an executive order of the President of the United States, included in and made a part of the said San Carlos Indian reservation; that in or about the year 1872 a certain military reservation of the United States, known and designated as the Ft. Thomas military reservation, was established, and the lands hereinafter described as being lands be-

longing to the defendant, save and except lot 1 of section 26 in township 4 S., range 22 E., were included and became a part of said Ft. Thomas military reservation; that said Ft. Thomas military reservation was abandoned by the United States in or about the year 1884.

During all of the times the said lands were used by the United States as a military reservation, and prior and subsequent to the time when the lands upon which said springs are situated were included within said Indian reservation, the waters from said Goodwin Springs were used upon said lots 1, 4, and 5, of section 26, and lot No. 8 and the N. W. ¼ of the N. W. ¼ of section 26, for domestic, culinary, and agricultural purposes, and by the use thereof there was during all such time raised upon said lands crops of grain, grass, and vegetables. Said crops were raised by the United States military forces then occupying said military reservation, and were used and consumed for government and army purposes. Said lot 1 in said section 26, not having been included in said Ft. Thomas military reservation, was, after the abandonment of said Camp Goodwin military reservation, settled upon by one Reynolds, and during the period from 1872 until subsequent to the abandonment of said Ft. Thomas military reservation, continuously used water flowing from said springs for the irrigation, cultivation, and raising of crops thereon.

That upon abandonment of said military reservation the said above-described lands, together with other lands within said reservation, were thrown open to settlement and entry under the laws of the United States, and that, pursuant to the laws of the United States relating to lands on abandoned military reservations, the value of said lands were appraised, the appraisers thereof fixing the value of said above-described lands with reference to the value of said waters from said Goodwin Springs for use upon and in irrigating said lands, which had been and could thereafter be used and applied upon the said lands as a means of irrigating said lands and the raising of crops thereon, a portion of the lands being appraised at a value of $15 per acre, and a portion thereof at a value of $5 per acre; that William Forbes paid the government the sum of $15 per acre for said lot No. 1 in said section 26, being a portion of the land the defendant is now, and has at all times mentioned herein, been irrigating by and with water from said Goodwin Springs, which amounts of $15 and $5 per acre, in accordance with said appraisement, this defendant has partially paid and will be required to pay to the government of the United States as a consideration to obtain full title to the lands hereinafter described, upon which the defendant made homestead entry under the laws of the United States, and upon which final proof has been made since the commencement of this action, while lands within such military reservation not having any water rights, and upon which the waters from said Goodwin Springs had not and could not be used or applied for irrigation purposes, were appraised at a value of 10 cents per acre, and were thrown open for entry and offered for sale by the United States at the value of $1.25 per acre.

That the homestead entry of the defendant was numbered 03541 in the United States land office at Phœnix, Ariz., and was made on the ——— day of November, 1906, he being then and at all times qualified to make such entry and obtain title from the United States. The lands embraced within such entry are lots 4 and 5 of section 26, and lot 8 and the N. W. ¼ of the N. W. ¼ of section 25, township 4 S., of range 22 E.

That prior to the said entry of the defendant certain lands now owned by him, to wit, lot 1 in section 26, township 4 S., range 22 E., were, on the 2d day of November, 1896, purchased from the United States by one William Forbes, to whom patent therefor was issued on the 19th day of April, 1897, and that said lands, together with the water rights appurtenant thereto, were afterwards conveyed to the defendant; that prior to the defendant's homestead entry certain persons had from time to time settled upon or made entries of the lands afterwards entered by the defendant and had used the water from said springs thereon, but had abandoned or relinquished the lands so settled upon or entered by them and ceased to occupy the same. Said persons sold and executed instruments of conveyance to the defendant of all their rights to the waters of said springs and the right to use the same claimed by them. Certain of said persons had made and recorded locations of claims to the waters of said springs.

That since the abandonment of said military reservations the defendant and the various persons who settled upon and made entries upon said lands, and who purported to convey their rights and interest to the defendant, have continuously used the waters from said Goodwin Springs upon said lands for a beneficial use thereon and for the irrigation and raising of crops thereon; that in or about the year 1896, the defendant's grantors constructed at a point east of the boundary line of said Indian reservation a reservoir, and in or about the year 1910 defendant enlarged said reservoir, so that it has a capacity of approximately 200 acre feet of water; that in the year 1912 defendant also sunk certain wells near the boundary of said reservation, but without said reservation, and has since pumped waters from said wells, and since the construction of said reservoir has caused the water from said springs, at seasons other than cropping seasons, and the surplus waters pumped from said wells and certain flood waters, to be conducted to said reservoir and there stored to be subsequently used in irrigating said lands. In the construction of said reservoir defendant has expended large sums of money.

At all times herein mentioned the waters flowing from said springs have been conducted through ditches or canals, in order to conserve the same, to and upon the lands now owned by the defendant. During the years 1910 and 1911 the defendant entered upon said Indian reservation and constructed a new ditch from said springs for the purpose of better conserving and of conducting said waters upon said lands so occupied by him, and also cleaned, repaired, and improved the then existing ditches and canals thereon for the same purpose, with no substantial injury or damage to the said lands within the said Indian reservation, and to no greater extent than for many years prior thereto had been done, and has since, by means of said ditches and canals, conducted said waters to and upon his said lands and has used the same thereon as aforesaid.

That on August 28, 1911, the irrigable land on the reservation upon which said springs are situated was, by the superintendent, assigned, in writing, to an Indian known as C. F. 65, or Skatizza, whose English name is George Wright; that said Indian fenced said lands and put in a crop of wheat thereon; that defendant would not permit said C. F. 65, or George Wright, to use any of the waters of Goodwin Springs, and that as a result his crop was a failure; that on June 18, 1912, said Indian, in writing, abandoned said land.

That on June 17, 1913, said lands on which said Goodwin Springs are located were assigned to Mrs. Alice Bossett, an Apache Indian woman of the San Carlos division of the White Mountain reservation. That the Indian office has agreed to build a house on said lands for said Mrs. Bossett, on the reimbursable plan authorized by act of Congress; i. e. by permitting her to pay for said house in four annual payments.

That, unless restrained by this honorable court, defendant will continue to use the said waters upon the said lands for a beneficial purpose; that without the right to use the water from said springs upon said lands and irrigate the same therewith, crops cannot be raised thereon, and the said homestead entry and said lot No. 1 of section 26 are of little value, and the said defendant would lose his labor and money expended in improving and bringing under cultivation a considerable portion thereof and the purchase price paid therefor; that with the right to the use of such water from said springs to irrigate said homestead entry and lot No. 1 are of great value.

That neither the defendant nor any of the prior occupants on any of the lands now owned by him took any steps to secure the right to construct ditches or canals or to secure the right of way therefor upon or over any part of said Indian reservation under any act of Congress or regulation of the Department of the Interior relating thereto.

Three questions arise on these facts, and will be discussed in the order in which they were presented at the oral argument:

[1] I. What is the character of the rights possessed by Indians in the land embraced within Indian reservations?

This question has been settled by repeated decisions of the Supreme

Court of the United States. In the case of Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440, that court said:

"The right which the Indians held was only that of occupancy. The fee was in the United States, subject to that right, and could be transferred by them whenever they chose. * * * The right of the United States to dispose of the fee of lands occupied by the Indians has always been recognized by this court from the foundation of the government."

Numerous cases are cited as affirming this doctrine. See also Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; and Spaulding v. Chandler, 160 U. S. 395, 16 Sup. Ct. 360, 40 L. Ed. 469.

[2] II. Are the waters on an Indian reservation reserved for the use of the Indians?

Counsel for the government contend that, so far as reservations created by treaty are concerned, this question has been settled by the Supreme Court in the case of Winters v. United States, 207 U. S. 564, 28 Sup. Ct. 207, 52 L. Ed. 340, and also that the rights of the Indians are the same no matter how the reservation may have been created. Counsel refer to the Winters Case as the principal authority with respect to water rights on Indian reservations and the right of the government in such waters.

The decision in that case is based solely on the agreement with the Indians and the implications which the court draws from the facts surrounding the creation of the Ft. Belknap reservation, and it is expressly stated therein that the reservation as a whole would be made unfit for the purposes for which it was created and incapable of maintaining the Indians if the waters of the Milk river were diverted as was done by the defendants. The bill in that case alleges that long prior to the diversion of the waters by the defendants the United States and the Indians had diverted 11,000 miners' inches of water, and used them beneficially on lands within the reservation, and that by means of such diversion and use of waters the United States "has been enabled by means thereof to train, encourage, and accustom large numbers of Indians residing upon said reservation to habits of industry, and to promote their civilization and improvement," and it was alleged with detail that all the waters were necessary for these purposes. It is thus expressly alleged that the United States and the Indians had actually used and appropriated the waters before the defendants had. It is clear that the use of the waters was necessary to the objects of the creation of the reservation, and it is a fair implication that the government and the Indians intended to reserve all the means necessary to that end.

[3] In the case at bar, the prior use of the water from the springs was devoted to the use of the United States and its soldiers on the military reservation, and it is nowhere alleged that the entire flow from the springs is necessary to the objects for which the reservation was created. On the contrary, the facts are that the waters of the springs are a negligible quantity as compared with the other springs on the reservation. Manifestly, then, the use of these waters is in no just sense necessary to the objects for which the reservation was created, and their use on lands outside the reservation neither defeats

nor impedes the fulfillment of the purposes which actuated the creation of the reservation here involved. The United States cannot be held to have reserved waters which it had never used for Indian reservation purposes, and which are physically incapable of supplying irrigation to an amount of land in the reservation sufficient to support more than one or two people, which, in effect, would be a denial or subordination on the part of the United States of the use to which the United States had itself applied the waters on lands outside the reservation.

Again, no just object of the creation of the reservation will suffer by devoting the waters to such use as will make them of most benefit to the users, and it is plain that the lands inside the reservation will not permit the full use of these waters. The view that the Winters Case, supra, turned solely on the agreement with the Indians, is strengthened by an examination of the brief of counsel for the United States, when they say on page 573 of 207 U. S. (28 Sup. Ct. 207, 52 L. Ed. 340):

"Under the just and reasonable construction of this agreement with the Indians, considered in the light of all the circumstances and of its express purpose, the Indians did not thereby cede or relinquish to the United States the right to appropriate the waters of Milk river necessary to their use for agricultural and other purposes upon the reservation, but retained this right, as an appurtenance to the land which they retained, to the full extent in which it had been vested in them under former treaties."

This view was sustained by the Supreme Court of the United States, and is the sole basis out of which the equities in favor of the Indians arise. The decision is not an authority that the mere creation ex vi termini reserves to the Indians, or to the United States for their benefit, the beneficial use of all waters flowing within the reservation. There is no treaty right of the Indians involved in this case, and there are no equities growing out of such treaty or agreement in the case. The United States certainly had the right to devote waters rising within the reservation to the use of people living outside the reservation, and the Indians could not complain.

Again, the lands on which the springs rise were, before they were placed in the Indian reservation, a part of the military reservation, and the waters were then used on the lands of the defendant, which were within the military reservation. Can it be said that, after that use had been permitted by the government, it intended to abandon its policy to open abandoned military reservations to settlement, and to devote these waters to a lesser use, to a use not essential to full enjoyment by the Indians of all advantages flowing from the establishment of the reservation, and to deprive the settlers to whom it had, in compliance with its laws, sold the lands embraced within the military reservation?

It is not alone a question of the *power* of the United States to devote these waters to the exclusive use of the Indians, but it is a question of whether it has *exercised the power*. The only act relied on by the government to reach this result is the placing of the lands on which the springs arise within the Indian reservation, and it seems to me

that this falls far short of evidencing such an intention or showing such a purpose.

III. Has the defendant any derivative right to the use of the waters superior to that of the government?

The same officers of the government charged with the protection of the Indians also execute its land laws, for both are under the charge of the Secretary of the Interior, and his action in approving the sale of the land with water rights is of equal dignity and binding force on the government as the demand now made by his subordinate with his approval for the use of the waters by the Indians. It is as much the policy of the United States to have abandoned military reservations settled up as it is to provide a reservation for the Indians. It is shown that 15 acres of land within said reservation are susceptible of cultivation and irrigation by means of the waters from said springs; but it will hardly be contended that the use of these waters for agricultural purposes is essential to the comfort or welfare of the Indians on the reservation.

It seems to me, under all the facts of the case, that it would be inequitable to permit the said waters to be diverted from defendant's lands and used upon the 15 acres of land within the reservation, and therefore a judgment will be entered for the defendant.