## SKEEM et al. v. UNITED STATES et al.

### (Circuit Court of Appeals, Ninth Circuit.  May 2, 1921.)

### No. 3528.

1. **Indians ⊛⟷11, 16(4)—Treaty reservation of irrigation water rights held to reserve right to waters necessary for land subsequently reduced to cultivation; water rights not lost by lease of land.**

   As respects lands on the Ft. Hall Indian Reservation, occupied and retained by Indians under article 6 of the Ft. Bridger Treaty, ratified February 24, 1869 and the treaty ratified by Act Feb. 23, 1889, *held* that, the treaty of 1898 ceding to the government land comprising the southern portion of the reservation, but providing that Indians occupying and making their homes on lands under the earlier treaty might retain them, did not, by providing in article 8 "that water from streams on that portion of the reservation now sold, which is necessary for irrigation on land actually cultivated and in use, shall be reserved for the Indians now using the same so long as said Indians remain where they now live," operate to limit the extent of the water rights of the occupying Indians, by reserving to them only the quantity of water necessary for the irrigation of such of their lands as were at the time of the 1898 treaty irrigated, but the reservation covered water subsequently required for land later reduced to cultivation, and furthermore reserved water rights to the use of tenants of the land in case they were leased by the Indian allottees under Act June 25, 1910, and neither the actual leasing of their lands nor the surrender of possession to the lessees operated to relinquish any water rights in the land which the Indians chose to retain.

2. **Indians ⊛⟷11—All rights not specifically granted by Indians in treaty are reserved to them.**

   By an Indian treaty granting Indian lands to the United States, all rights not specifically granted are reserved to the Indians.

3. **Indians ⊛⟷11—Treaty provisions as to lands occupied by Indians liberally construed in favor of such occupant.**

   Provisions of Indian treaties respecting lands occupied and cultivated by Indians, such as article 11 of the Ft. Bridger Treaty, ratified February 24, 1869, and article 3 and 8 of the 1898 treaty with the same Indians, should be construed in the light of the purpose of the government to induce the Indians to relinquish their nomadic habits and till the soil, and such meaning should be given them as will enable the Indians to cultivate eventually the whole of their lands so reserved to their use.

4. **Indians ⊛⟷11—Treaties construed in their favor.**

   Where there is ambiguity in a treaty granting Indian lands to the government, the language used in the treaty should not be construed to the prejudice of the Indians.

Appeal from the District Court of the United States for the Eastern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the United States and another against C. S. Skeem and others.  Decree for plaintiffs, and defendants appeal.  Affirmed.

J. H. Peterson and T. C. Coffin, both of Pocatello, Idaho, for appellants.

J. L. McClear, U. S. Atty., and J. R. Smead, Asst. U. S. Atty., both of Boise, Idaho, for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

⊛⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

GILBERT, Circuit Judge. [1] The United States brought a suit on behalf of certain Indians who had belonged to the Ft. Hall Indian reservation, to determine their rights as against the appellants herein to the waters of Indian creek for irrigation purposes. In 1868 a treaty was consummated between the United States and the Bannacks and the eastern band of the Shoshones, known as the Ft. Bridger Treaty, which in 1869 was ratified by Congress (15 Stat. 673). Article 6 of the treaty provided that any Indian who might desire to commence farming might select a tract of land "within the reservation of his tribe" for agricultural purposes, and that thereafter he should have the exclusive possession of the same, and that thereafter said land "may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long as he or they may continue to cultivate it." In 1880 a second treaty was entered into, by which it was directed that allotments in severalty should be made on the Ft. Hall reservation, one to each head of a family, and to other persons belonging to the tribes on such reservation. It was further provided that the reserved lands should be surveyed for the purpose of such allotment, and that the same after allotment should be patented. The treaty was ratified in 1889 (25 Stat. 687). In 1898 (31 Stat. 672) a treaty was made whereby the Indians ceded to the United States a large body of land comprising the southern portion of the reservation. The treaty provided that any Indians who had taken lands and made homes on the reservation and were then occupying and cultivating the same under the sixth article of the Ft. Bridger Treaty, should not be removed from the ceded lands, but might retain the tracts of which they had taken possession under the earlier treaty and might receive allotments of the same.

The Indians whose rights were asserted by the government in the present suit had taken possession of and had commenced the cultivation of the lands involved in the suit. This they had done some years prior to the treaty of 1889. They elected to retain the lands which they occupied. The act whereby the treaty of 1898 was ratified provided that any portions of the ceded tract retained by Indians in accordance with the Ft. Bridger Treaty should be allotted to them before any of the ceded lands should be open to settlement or entry. All the remainder of the ceded lands were made subject to entry under the homestead, townsite, stone, timber, and mining laws of the United States. Thereafter the lands were surveyed and allotted, and included among the allotments were the lands of the Indians whose rights are involved in the present controversy. Trust patents were issued for the benefit of the Indians, containing a provision that the lands so patented "shall not be subject to the judgment, order, or decree of any court."

Article 8 of the treaty of 1898 provides:

"That water from streams on that portion of the reservation now sold which is necessary for irrigating on land actually cultivated and in use shall be reserved for the Indians now using the same, so long as said Indians remain where they now live."

The appellants contend that the article operates to limit the extent of the water rights of the Indians, and that it reserves to them only

the quantity of water necessary for the irrigation of such portions of their lands as were at that time actually irrigated, and that they were without authority to use water for the irrigation of the remainder of their lands in case they might subsequently reduce the same to cultivation. The court below, properly, we think, ruled against this contention. The language of article 8 should be construed in the light of the following considerations:

[2] First. The grant was not a grant to the Indians, but was a grant from the Indians to the United States, and such being the case all rights not specifically granted were reserved to the Indians. United States v. Winans, 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089; Winters v. United States, 207 U. S. 564, 28 Sup. Ct. 207, 52 L. Ed. 340.

[3] Second. Article 8 should be construed together with article 3 of the same treaty, which provides:

"Where any Indians have taken lands and made homes on the reservation, and are now occupying and cultivating the same, under the sixth section of the Ft. Bridger Treaty hereinbefore referred to, they shall not be removed therefrom without their consent, and they may receive allotments on the lands they now occupy; but in case they prefer to remove they may select land elsewhere on that portion of said reservation not hereby ceded, granted, and relinquished, and not occupied by any other Indians."

The right so conceded to the lands the Indians "are now occupying and cultivating" clearly refers to the lands of which they were in possession, and not to that portion of the lands which they had actually cultivated and irrigated, and article 8 should be given no narrower construction than Article 3. Article 8 should also be construed in the light of the Ft. Bridger Treaty, article 11 of which provided:

"No cession by the tribe shall be understood or construed in such a manner as to deprive without his consent any individual member of the tribe of his right to any tract of land selected by him, as provided in article 6 of this treaty."

The purpose of the government was to induce the Indians to relinquish their nomadic habits and to till the soil, and the treaties should be construed in the light of that purpose and such meaning should be given them as will enable the Indians to cultivate eventually the whole of their lands so reserved to their use.

[4] Third. If there is ambiguity, the language used in the treaty should not be construed to the prejudice of the Indians. Choctaw Nation v. United States, 119 U. S. 1, 27, 7 Sup. Ct. 75, 30 L. Ed. 306.

It is contended further that article 8 reserves water rights only to the Indians "now using the same, so long as said Indians remain where they now live," and that the court below erroneously ruled that such rights were reserved to the use of tenants of the lands in cases where the Indians had leased the same. The litigation concerns seven contiguous allotments of 80 acres each. Two of the allottees had died before the commencement of the suit, and all the allotments were leased to the appellee Hofhine in 1914, and the allottees have not since resided thereon. By Act of Congress of June 25, 1910 (36 Stat. 855), it was provided:

"That any Indian allotment held under a trust patent may be leased by the allottee for a period not to exceed five years, subject to and in conformity with such rules and regulations as the Secretary of the Interior may prescribe."

Regulations were prescribed, and many leases were made of Indian allotments. The treaty of 1898 provided that the Indians who held isolated tracts on the land ceded to the United States might retain the same, or if they chose to do so might remove to the reservation. The clause of article 8, "so long as said Indians remain where they now live," referred to those who chose the latter alternative, and it seems clear that water was intended to be permanently reserved for the tracts which the Indians chose not to relinquish, and that neither the actual leasing of their lands under the authority to lease nor the surrender of possession to the lessees operated to relinquish any water rights in the lands which they so chose to retain. This is the view which the executive authorities took, for the patents which were issued for all allotments were identical in their provisions, and made no distinction between the lands allotted to individuals who retained their isolated tracts and the lands allotted to those on the larger reservation. They contained no provision that any rights should be lost in the event the allottee should lease his allotment or absent himself therefrom.

The decree is affirmed.