### UNITED STATES v. POWERS et al.

#### No. 2962.

District Court, D. Montana.
July 29, 1936.

John B. Tansil, U. S. Dist. Atty., of Butte, Mont., and Kenneth R. L. Simmons, of Billings, Mont., for the United States.

T. H. Burke, E. E. Collins, Ben Harwood, Johnston, Coleman & Jameson, and Franklin A. Lamb, all of Billings, Mont., for defendants.

PRAY, District Judge.

This is a suit in equity brought by the plaintiff to restrain the twenty-two defendants above named from in any manner diverting the waters of Lodge Grass creek and the Little Big Horn river and their tributaries, flowing within the Crow Indian Reservation in Montana, and from maintaining dams and ditches therein, and from interfering in any manner with the flow of these streams and their tributaries, and the use of the waters thereof. The order to show cause issued by the court was later vacated, and upon denial of the motions to dismiss the complaint, the defendants were granted until October 10, 1934, to file their answers. On that date answers were filed by all of the defendants, except Thomas R. Powers, Edward Schroeder, Reg. Pearce, George S. Gibson, Joseph A. Graham, Dominic Stevens, and C. E. Linthacum, whose defaults were duly entered. Replies were filed by plaintiff to all answering defendants. Motions to make certain other parties defendants were denied.

This reservation was created and set apart for the benefit of the Crow Indians by Treaty of May 7, 1868 (15 Stat. 649). Later on the reservation was diminished by other treaties (22 Stat. 42, 26 Stat. 1039, and 33 Stat. 353, 357). It is agreed that the present boundaries of the reservation as set forth in the complaint are correct. The work of making allotment of lands to the Indians was commenced in 1885, under the Act of April 11, 1882, which ratified the agreement of the Indians submitted June 12, 1880. Allotments were continued under the Act of February 8, 1887 (24 Stat. 388).

The Act of Congress of March 3, 1891 (26 Stat. 989, 1039, § 31), ratified the agreement of December, 1890, with the Crow Indians whereby they ceded a part

of the reservation; this agreement provided that any person entitled to the privilege of selecting land in severalty under the provisions of the sixth article of the Treaty of May 7, 1868 (15 Stat. 649, 650), should have the right of selection in any part of the ceded strip or portion for a period of sixty days under this agreement.

Allotment work was begun May 28, 1890, under the general allotment act, and continued in 1901 under the acts of February 8, 1887 (24 Stat. 388), and February 28, 1891 (26 Stat. 794), and as specified in the Act of April 11, 1882 (1 Kappler Indian Laws & Treaties, 195). The quantity of irrigable land to be given each Indian was fixed at forty acres. Plaintiff claims that none of the lands now owned or in control of the defendants were classified as irrigable lands for the reason that none of them were situated under the Crow Irrigation Project. That allotments were made in March, 1921, under the Act of June 4, 1920 (41 Stat. 751). That under the Act of June 25, 1910 (36 Stat. 855, 856, 859), there was allotted the remaining unallotted lands, and that the agent classified all the allotted and unallotted lands in units of forty acres, making one unit of irrigable land under government constructed ditches equivalent to two units of nonirrigable agricultural land and four units of nonirrigable grazing land. That all of the lands owned or controlled by the defendants were classified by the agent, Charles E. Roblin, as grazing or agricultural land, with the exception of portions of three forty-acre tracts owned by the defendant Antler Land Company, which were classified as irrigable; two of them lie under a proposed ditch known as upper Little Horn No. 1, which has never been constructed, and the third lies partly under the Bozeman Trail Ditch and the above-named proposed ditch.

That all of the lands of the defendants are situated within the boundaries of the Crow Indian Reservation in the state of Montana, which were acquired, either by mesne conveyances from the original Indian allottees, or their successors in interest, or by purchase at government sale of deceased allottees' lands, as authorized by the Act of May 8, 1906 (34 Stat. 182, 3 Kappler 181 [25 U.S.C.A. §§ 349 and note, 404 note]).

The waters diverted by these defendants are from Little Big Horn river or Lodge Grass creek, or their tributaries. Some of the defendants introduced in evidence notices of appropriation of water under the Montana statutes from these streams. None of the allotments were approved until March 27, 1907. The Act of May 8, 1906, removed the twenty-five year restriction period and allowed patent in fee to issue to the Indian whenever the Secretary of the Interior considered him competent. The Crow Irrigation Project had its beginning in the construction of the Reno Ditch in 1884 and 1885, which was enlarged and extended in 1917. The Act of March 3, 1891, was in pursuance of an agreement with the Indians to construct the Crow Irrigation Project with moneys due the Crow Tribe for the cession of their right to occupancy of certain tracts of land to the United States. This act gave the Secretary authority to expend $200,000 "in the building of dams, canals, ditches, and laterals for the purposes of irrigating in the valleys of the Big Horn, and the Little Big Horn Rivers and on Pryor Creek and such other streams as the Secretary of the Interior may deem proper." 26 Stat. 1039, 1040, § 31.

May 5, 1891, a Superintendent of Irrigation was appointed with instructions as follows: "The general plan should include such separate systems as may be necessary to properly irrigate the different portions of the reservation, but the aim to serve the greatest amount of irrigation of Indian lands with the least expense, should be strictly followed."

That the dates of construction and carrying capacities of each government ditch is as follows:

| Date of construction. | Ditch. | Capacity. |
|---|---|---|
| 1885 | Reno | 85 Cu. ft. per second. |
| 1893 | Forty Mile | 89 " " " " |
| 1893 | Lodge Grass No. 1 | 223 " " " " |
| 1892 | Agency | 209 " " " " |
| 1904 | Lodge Grass No. 2 | 37 " " " " |
| 1910 | Upper Little Horn No. 2 | 115 " " " " |

Surveys were made for the proposed ditches known as Little Big Horn Nos. 1 and 3, but were rejected. That by 1915 the approximate irrigable acreage by means of this project had been determined as follows:

| | |
|---|---|
| Upper Little Horn No. 2 | 3,248.36 acres. |
| Forty-Mile Ditch | 1,060.42 " |
| Reno Ditch | 3,619.13 " |
| Agency Ditch | 6,149.19 " |
| Lodge Grass No. 1 | 4,868.38 " |
| Lodge Grass No. 2 | 1,828.52 " |

That the acreage actually irrigated by the said project in the Little Big Horn and Lodge Grass areas from waters of these streams and their tributaries during 1934 was 8,084 acres divided among the above units as follows:

| | |
|---|---|
| Agency Unit | 2,347 acres. |
| Reno Unit | 1,696 " |
| Forty-Mile Unit | 311 " |
| Upper Little Horn No. 2 Unit | 1,783 " |
| Lodge Grass No. 1 Unit | 1,132 " |
| Lodge Grass No. 2 Unit | 210 " |

That this project is owned jointly by the United States and the Crow Indians. Expenditures for construction to June 30, 1926, amounted to $1,977,890.10, of which sum, $1,565,235.31 were expended from tribal funds, $139,049.02 from gratuity appropriations, and $273,594.77 from reimbursable appropriations.

That the construction of a majority of the private ditches on the reservation began in 1916, and that the construction of all the dams and ditches of the defendants and the diversion of the waters of these streams commenced many years after the construction of each of the government units, and after the use of the waters of said streams by the Crow Irrigation Project, so styled, with the exception of the Peters Ditch owned by the defendants Dethlefsen, which was begun in 1896. That no consent was ever given the defendants to construct their dams and ditches by the plaintiff.

That the Little Big Horn river is an unnavigable stream rising in the Big Horn Mountains and flowing in a northerly direction across said reservation, crossing the southern boundaries thereof and emptying into the Big Horn river near Hardin, Montana. That the diversions from the Little Big Horn river are set out on the map introduced by plaintiff as they appear going downstream, as follows:

Tschirgi Ditch.
Upper Little Horn Ditch No. 2 (government).
Bozeman Trail Ditch (private diversion).
Belken-Campbell Ditch.
Forty-Mile Ditch (government).
Hennan Ditch.
Reno Ditch (government).
Agency Ditch (government).

The Bozeman Trail Ditch Company diverts the waters of said river for the irrigation of lands owned by whites and members of the Crow Tribe, under a grant to it by the United States. At the time the agreement was made respecting this grant of authority so to divert the waters aforesaid, 1,961 acres were owned by the Indians and 858 by the white men. Lodge Grass creek is a stream rising in the Big Horn Mountains and flowing in a northerly direction on the said reservation and emptying into the Little Big Horn river near Lodge Grass, Montana. The diversions made from this creek, going downstream, as shown on the map, are as follows:

Yates Ditch.
Dethlefsen Peters Ditch.
Billie Miller Ditch.
Robert J. Miller Ditch.
Lodge Grass No. 2 (government).
Lodge Grass No. 1 (government).

That the principal diversions of the defendants on each of these streams are made above the government's diversions.

Plaintiff further claims that there was not enough water available during the season of 1934 to successfully irrigate the acreage actually farmed under the said project; that crop losses occurred that year to whites and Indians alike who owned or leased lands under this part of the project; and that such shortage of water was due to a considerable extent to the diversions of the defendants. That in many cases crops were abandoned under the Reno, Agency, and Lodge Grass Units. That there was not enough water during that year to irrigate the Indian-owned lands in that area, nor was there enough water available from 1931 to 1934, inclusive, to successfully irrigate the lands then being farmed under the project in this area, and that this was admitted by defendant M. H. Tschirgi, in charge of

the major diversion of the defendant Antler Land Company. Defendants admit in their answers that they have been diverting the waters of the streams in question for several years, claiming a right thereto for the irrigation of their lands on the theory that each allotment susceptible of irrigation on the Crow Indian Reservation is entitled to its pro rata share of the waters of streams flowing through or bordering upon said reservation; that this right dates back to the Treaty of May 7, 1868, and that each acre of irrigable land owned or in the control of the defendants is entitled to the same amount of water as each acre of irrigable land under government constructed ditches. On the other hand, the United States claims the right to exclusively use, regulate, and control the waters of these streams for use in its Crow Indian Irrigation Project system without interference or depletion of the supply from any source.

Plaintiff contends that prior to the establishment of this reservation by Treaty of May 7, 1868 (15 Stat. 649), the United States was the absolute owner of the usufruct of all unnavigable waters which it had not already granted to private persons, and that it has continued to retain such ownership unless by some act of Congress it has granted it to others or estopped itself from asserting it as against those who have been using the waters of these streams and their tributaries under a claim of right.

That the lands in which the defendants claim ownership on this reservation were the original allotments to members of the Crow Tribe, and that upon the death of these original allottees the plaintiff as guardian of their heirs sold the lands at public sale and that the defendants, or their predecessors in interest, became the purchasers, and that the government thereupon issued a patent in fee to the purchasers at such sales containing the following language: "together with all rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging." The patent made no reservation of water or water rights. In some instances fee patents to the lands were issued to the Indians, and they in turn conveyed to the defendants; the patents being in the same form as those used in public sales of lands of deceased allottees, and conveying the appurtenances. The Indian patentees conveyed by warranty deed "the premises, together with all tenements, hereditaments and appurtenances"; no water or water rights being reserved therein.

The parties to the suit seem to agree that under the Treaty of May 7, 1868, the lands on the reservation were recognized as the common property of the Crow Tribe. Under the interpretation of a like treaty in the Winters' Case (Winters v. U. S., 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340, Id. [C.C.A.] 143 F. 740), the use of the waters of the streams on the reservation were reserved to the Indians. They were to be instructed in agricultural pursuits and the waters were to be used to irrigate their lands. They were to become farmers and water for irrigation was necessary to mature their crops. The era of dry land farming had not then dawned. Under the Crow treaty the Indian could select his own land. After that came the survey followed by the allotment of the land selected. A twenty-five year trust patent was issued to the Indian which finally resulted in a patent in fee; thus he became the owner of the land and the use of water to irrigate it to the extent of forty acres. It seems to be plain that each Indian thereby secured a vested right to the use of sufficient water to irrigate his irrigable land; at any rate, that he would be entitled to his pro rata share of the available water supply for that purpose. Not all of the Indians who had irrigable land were served with water under the government projects, but they possessed the right to use. Some constructed their own ditches, while others joined in building a common ditch. One Indian was entitled to just as much water as another measured by his needs and the available supply.

It seems to be understood by the parties to the suit that the treaty of May 7, 1868, determines the rights of the government and the Indians in respect to the lands and waters here involved, and that it does not appear from any subsequent treaty or act of Congress that such rights have ever been impaired or destroyed. This treaty was in effect a grant by the Indians, but certain rights were reserved under the treaty. When the Indians made the treaty with the government, they reserved rights to the use of the waters at least to an extent necessary to irrigate their lands, and the rights so reserved continue to exist against the United States and its grantees as well as against the state and its grantees. (Winters v. U. S.

[C.C.A.] 143 F. 740), and again to the same effect in U. S. v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089; Skeem v. U. S. (C.C.A.) 273 F. 93, 95; U. S. ex rel. Ray v. Hibner (D.C.) 27 F.(2d) 909, 911. No question that before and when the treaty was ratified the Indians had control of the land and waters; it was so held in the Winters Case in construing a treaty like that of May 7, 1868. In that case the waters evidently were intended for use on the diminished reservation and Winters had diverted them to lands on the ceded strip, that is, outside of the reservation. Ft. Belknap Treaty, May 1st, 1888, 25 Stat. 113.

It was held in Minnesota v. Hitchcock, 185 U.S. 373–389, 22 S.Ct. 650, 656, 46 L.Ed. 954, 963: "The fee of the land was in the United States, subject to a right of occupancy by the Indians. That fee the government might convey, and whenever the Indian right of occupancy was terminated (if such termination was absolute and unconditional) the grantee of the fee would acquire a perfect and unburdened title and right of possession." Does the water belong to the tribe or the Indians, and if to the latter does it go to the purchaser as something appurtenant to the land? Tribal lands were held in common prior to the general allotment act of February 18, 1887. There was no ownership in severalty, and upon the death of an Indian such rights as he possessed in the use of land and water ceased. Section 7 of the above allotment act provided as follows: "That in cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior be, and he is hereby, authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservation." 24 Stat. 388, 1 Kappler 35 (25 U.S.C.A. § 381). Clearly the purpose of this statute is to provide for the distribution of water to the individual Indian. A just and equal distribution must be made, and the duty devolving upon the Secretary is to provide the rules and regulations therefor.

The government's theory is that the waters are reserved for the tribe, rather than for the individual Indians, but authorities cited by both sides do not seem to support that theory. Winters v. U. S., supra; Winters v. U. S., 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340; U. S. v. Conrad Inv. Co. (C.C.) 156 F. 123, 127; Conrad Inv. Co. v. U.S. (C.C.A.) 161 F. 829; U.S. v. Wightman (D.C.) 230 F. 277; Skeem v. U.S. (C.C.A.) 273 F. 93; U. S. v. Parkins (D.C.) 18 F.(2d) 642; U. S. ex rel. Ray v. Hibner (D.C.) 27 F.(2d) 909, 912; Scheer v. Moody (D.C.) 48 F.(2d) 327, 331.

In the Hibner Case, supra, it was held: "The right of the Indians to occupy, use, and sell both their lands and water is now recognized, as this view is sustained in the case of Skeem v. U. S., supra, [273 F. 93] and, such being the case, a purchaser of such land and water right acquires, as under other sales, the title and rights held by the Indians, and that there should be awarded to such purchaser the same character of water right with equal priority as those of the Indians."

The case of Mason v. Sams (D.C.) 5 F.(2d) 255, is cited by defendants as illustrating the attitude of the court where any discrimination is shown in favor of one Indian as against another, such as the defendants' reference to the claimed right on the part of the Secretary of the Interior to give water to one Indian to the detriment of another, quoting from the regulation: "To provide for the irrigation of the largest quantity of land selected by the Indians for allotment or likely to be selected by them at the least expense." Defendants assert this plan was not carried out, but that irrespective of expense the government has attempted to furnish water to one piece of land and not to another which is equally entitled to it. In Mason v. Sams, supra, under the Treaty of 1855 with Quinaielt or Taholah Indians (12 Stat. 971), it was held the right to fish was common to all members of the tribe, and that the Secretary was without authority to make regulations under which particular locations on Quinaielt river were assigned to individual members with exclusive rights therein, and requiring them to pay royalty on fish sold for the benefit of other members of the tribe. The point is made that regulations granting to certain members of the tribe the right to use the waters of the Little Big Horn river to the exclusion of other members is a similar usurpation of power. In Scheer v. Moody, supra, referring to rights of private ditches on the Flathead Indian Reservation, Judge Bourquin held: "Immaterial is it also whether or not the allottees'

appropriation of the waters was pursuant to rules by the secretary prescribed as authorized by the Act of 1887 aforesaid. The statute vests discretion in the secretary, is not mandatory, and is intended to restrict the recognized right of appropriation only so far as in the judgment of the secretary its exercise in absence of controlling rules would work injustice. Rules or not, the Indians' necessities were as great, their right to appropriate water no less, save to the extent exercised inequitably. And as before noted, the Indians' appropriations of water were known to, sanctioned by, and acquiesced in by the secretary, more effective than any of his rules and for which he perceived no necessity."

It does not seem to be of great importance whether the government irrigation works on the reservation are considered one system or several systems or projects. The Commissioner refers to systems in his letter to Graves. If the use of water was to be limited to the government irrigation system or systems, then defendants inquire: How can it justify its course in granting water to lands owned by the whites under the Bozeman Trail Ditch, which was a private ditch? The Indians gave the Secretary permission to construct irrigation ditches with tribal money, but they did not authorize him to use or withhold the use of water in respect to any particular piece of land or any particular Indian.

Article 6 of the Crow Treaty of 1868, 15 Stat. 650, hereinbefore referred to, is strongly relied upon as authority for the claim on the part of the government that the Indian did not have a right in perpetuity nor in fee simple absolute to the water right used in connection with the lands allotted to and occupied by him; that "a right to a life estate of a limited kind" is all that he received; that he and his family could use the water upon the allotment only so long as he or they may continue to cultivate it; that upon the death of the Indian or his heirs the right as user returned to the government. To this contention counsel for the defendants Dethlefsen make the following pertinent reply: "If that be so, then the white farmers under the Bozeman Trail Ditch, as well as under all government ditches, have no water rights. Under their theory the Indian would have the land and a water right for it only so long as he or his heirs possessed and continued to cul-

tivate it. No conveyance from an Indian of any land and water right owned by him to a white person would entitle the white owner to use any water for irrigation. The proof shows very few acres of land in the Little Big Horn and Lodge Grass Valleys were cultivated by Indians in 1934. Under their theory of the case and interpretation of article 6, no white men owning land on the reservation and under a government ditch had any more right to the use of water from the river or creek, or their tributaries, than had any of the defendants in this case. We are also of the opinion that the rule would extend to white men leasing Indian lands. If the contention of counsel is correct, then the Indians in possession and actually cultivating their land have the only prior rights to the waters of the Little Big Horn River, Lodge Grass Creek, and their tributaries. If white men acquired no water rights by purchase of Indian land, whether irrigated or not before sale, then the water rights as between the white men must be determined under the water right laws of Montana. In that case these defendants would have the first right after the Indians actually cultivating their own lands are supplied with sufficient water."

Counsel further contends that if the above theory of the case is correct they have stated themselves out of court, as no showing has been made as to the amount of water required by Indians actually cultivating their own lands after July 1, 1934. But it further appears under that same article 6 of the treaty the government issued fee-simple patents, conveying the lands and "all rights, immunities, privileges and appurtenances of whatsoever nature thereunto belonging." Such was the conveyance to Mrs. Peters and her children, who subsequently conveyed in like manner to the defendants Dethlefsen, while the lands were being occupied and cultivated by them. Such was substantially the terms of the conveyances to all other answering defendants herein. The basis for such action on the part of the government is found in the last paragraph of article 6 (15 Stat. 651), which reads as follows: "The President may at any time order a survey of the reservation, and, when so surveyed, Congress shall provide for protecting the rights of settlers in their improvements, and may fix the character of the title held by each. The United States may pass such laws on the subject of alien-

ation and descent of property as between Indians, and on all subjects connected with the government of the Indians on said reservations and the internal police thereof, as may be thought proper." So many authorities have so held that it may be accepted as a rule of law that the conveyance of land with its appurtenances, where no different intention is expressed, conveys the water right used to irrigate such land.

In U. S. v. Oregon, 295 U.S. 1, 27, 55 S.Ct. 610, 621, 79 L.Ed. 1267, the court said: "It is true, as was specifically pointed out in State of Oklahoma v. Texas, supra, 258 U.S. 574, 594, 595, 42 S.Ct. 406, 414, 66 L.Ed. 771, that the disposition of such lands is a matter of the intention of the grantor, the United States, and, 'if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies.' This was the effect of the decisions in Hardin v. Jordan [140 U.S. 371, 11 S.Ct. 838, 35 L.Ed. 428] supra; Mitchell v. Smale, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442; and Kean v. Calumet Canal Co., 190 U.S. 452, 23 S.Ct. 651, 47 L.Ed. 1134, in which conveyances bounded upon the waters of a nonnavigable lake were, when construed in accordance with local law, held impliedly to convey to the middle of the lake. * * * In construing a conveyance by the United States of land within a state, the settled and reasonable rule of construction of the state affords an obvious guide in determining what impliedly passes to the grantee as an incident to land expressly granted." See, also, Packer v. Bird, 137 U.S. 661, 11 S. Ct. 210, 211, 212, 34 L.Ed. 819. Montana cases relating to the rule on conveyances of land with the appurtenances follow: Tucker v. Jones, 8 Mont. 225, 19 P. 571; Sweetland v. Olsen, 11 Mont. 27, 27 P. 339; Beatty v. Murray P. M. Co., 15 Mont. 314, 39 P. 82; McDonald v. Lannen, 19 Mont. 78, 47 P. 648; Sloan v. Glancy, 19 Mont. 70, 47 P. 334; Smith v. Denniff, 23 Mont. 65, 57 P. 557, 50 L.R.A. 737; Kofoed v. Bray, 69 Mont. 78, 220 P. 532.

In Morrow v. U. S., 243 F. 854, 856, the Circuit Court of Appeals for the Eighth Circuit held: "There is no question that the government may, in its dealings with the Indians, create property rights which, once vested, even it cannot alter. Williams v. Johnson, 239 U.S. 414, 420, 36 S.Ct. 150,

60 L.Ed. 358; Sizemore v. Brady, 235 U. S. 441, 449, 35 S.Ct. 135, 59 L.Ed. 308; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; English v. Richardson, 224 U.S. 680, 32 S.Ct. 571, 56 L.Ed. 949; Jones v. Meehan, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49; Chase v. U. S., 222 F. 593, 596, 138 C.C.A. 117. Such property rights may result from agreements between the government and the Indian. Whether the transaction takes the form of a treaty or of a statute is immaterial; the important considerations are that there should be the essentials of a binding agreement between the government and the Indian and the resultant vesting of a property right in the Indian." Also see U. S. v. Chase, 245 U. S. 89, 38 S.Ct. 24, 62 L.Ed. 168.

The Winters Case, relied upon by plaintiff, seems to present a different state of facts from that involved here. Winters v. U. S. (C.C.A.) 143 F. 740; Id., 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340. There the white landowners claimed the superior right to the waters of Milk River by appropriation under the Desert Land Act of March 7, 1877 (19 Stat. 377, amended 26 Stat. 1096 [43 U.S.C.A. §§ 321–323, 325, 327–329]). Such waters were being used on lands outside the reservation. But it appears that the government and the Indians had diverted 11,000 inches of water from this river long before any diversion by Winters. In the present case the waters of the reservation have not been diverted from the lands for which they were intended according to the rule laid down in the Winters Case. But again the government contends that the Indian is entitled only to such amount of water as is required for the land he resides upon and cultivates. Here the defendants rely upon the doctrine of the Hibner Case from the Ninth Circuit, District Court of Idaho, 27 F.(2d) 909, 912. In this case the Bannock Indians had made selections and were allotted lands on the reservation under articles 6 and 11 of the Fort Bridger Treaty of July 3, 1868, 15 Stat. 673, which are the same articles and bearing the same numbers as in the Crow Treaty of May 7, 1868, 15 Stat. 649. The contention there was that the Indians were entitled only to such amount of water as they had actually put to a beneficial use and that they had no water right except as made by appropriation in the same manner as such right was acquired by white men. The Indians and their successors, the white men, claimed

that their rights did not depend upon occupancy or possession of the lands but was granted to the Indians by the Treaty of July 3, 1868. In reply it was asserted that if the Indians had any rights to water under that treaty, they lost them because of failure to reside upon the lands; that even if they had not lost their rights, by the strict terms of the treaty they were entitled only to such amount of water as was necessary to irrigate the lands actually cultivated and in use. The court disposed of these opposite views in the following language: "The status of the water right after it has passed to others by the Indians seems to be somewhat different from while such right is retained by the Indians, because the principle invoked by the courts for the protection of the Indian as long as he retains title to his lands does not prevail and apply to the white man, and the reason for so holding is that there was reserved unto the Indians the absolute right to own and use in their own way the water for their lands, while the white man, as soon as he becomes the owner of the Indian lands, is subject to those general rules of law governing the appropriation and use of the public waters of the state, and would, as grantee of the Indian allotments, be entitled to a water right for the actual acreage that was under irrigation at the time title passed from the Indians, and such increased acreage as he might with reasonable diligence place under irrigation, which would give to him, under the doctrine of relation, the same priority as owned by the Indians; otherwise, the application of any other rule would permit such grantee for an indefinite period to reclaim the balance of his land and withhold the application of the water to a beneficial use, which is against the policy recognized in the development of arid lands. * * * The Indians whose rights are asserted by the government in the present suit have elected to retain as their allotments the lands in question, which are within the tract ceded to the United States, and in the reservation, and are adapted to the raising of hay and grain thereon. Water from Toponce creek has and is now being used upon a portion of their lands in the production of wild hay. The defendants who are contesting the rights of the Indians urge that even such rights as may have been reserved to these allottees under article VIII have been lost through their failure since that date to reside on their lands, and further they say

that, even if that be not true, by the express terms of the treaty the exception to the grant is limited to such amount of water as is necessary for irrigating the lands actually cultivated and in use. This extreme view is thought to be untenable, as the effect of the treaties was to recognize and fix permanently the rights that the Indians had at the time the treaties were made, which was to a continuous use of a sufficient amount of water for the irrigation of their lands, and domestic purposes."

In that case the court granted to the Indian land a water right with priority as of the date of the ratification of the Fort Bridger Treaty. This rule applied to the defendants in this case seems to be fair and equitable and affords protection both to Indians and white men, and furthermore the facts there are very much like the facts in the instant case and were governed by like treaty provisions. From a perusal of the transcript of the testimony it seems to the court that these answering defendants upon receiving title from the Indian were reasonably diligent in placing under irrigation such portions of the land granted to them as were susceptible of irrigation. Some of the same questions presented here were decided by this court in U. S. v. Heinrich, 12 F.(2d) 938, especially referring to like patents and vested rights.

The numerous acts of Congress appropriating large sums of money for the purchase of water rights on Indian reservations covering a period of many years would seem to indicate that Congress and the Interior Department have not always adhered to the doctrine laid down in the Winters Case, but have been controlled to a great extent by the facts as they appeared to be in each particular instance. The government permitted white landowners on the Crow Reservation to acquire valuable water rights in the Little Big Horn river in its contract with Bozeman Trail Ditch Company. Counsel have furnished the court with lengthy quotations from Scheer v. Moody (D.C.) 48 F.(2d) 327, because of its apparent applicability to some of the principal questions involved in the present case, which have been given consideration in connection with other authorities, treaties, statutes, and regulations. The plaintiff complains that to allow the defendants the same water right the court has held his Indian predecessor in interest was entitled to will result in a deplorable situation respecting the various irrigation

systems on the Crow Indian Reservation and practically defeat the purposes for which they were constructed, but has not made it clear just how it will occur. The white man can acquire no greater or better right than the Indian himself possessed, and if the Indian had not conveyed his interests the right would have remained in him, and such water as he needed for irrigation might have been used by him, depending upon the available supply and the needs of others who possessed rights of equal standing. What difference does it make so far as the actual taking of the water is concerned whether the Indian retained it, turned it over to a lessee, as many have done, or sold it to the white man? Here was a small piece of land that could be irrigated with an appurtenant water right for that purpose. How can it wreck the systems on the reservation if the white man is permitted to stand in the shoes of his Indian grantor, or acquires the right at sales of deceased Indian allotments?

If the facts here were the same as in the Winters Case and the whites were taking the water under the desert land act, applying it to lands outside of the reservation and claiming superior rights to the Indians who had long prior to the advent of these desert land entrymen appropriated and used the waters of the stream in question, then it can be well understood how the Indians and their guardian might have cause to complain that their rights were being impaired, and how the great expenditure of money on irrigation works might go for naught if the entrymen should prevail in their suit and succeed in establishing a water right superior to the Indians. If the white men because of their advantageous position higher up the stream should deprive the Indians or their lessees lower down of their proportionate share of the waters flowing therein, then an efficient remedy is available to restrain the commission of such unlawful acts.

Another question urged as one of pressing importance, because of the weight of the testimony given by men of learning and experience, relates to the amount of water necessary properly to irrigate an acre of land. Counsel claim, and their claims seem to be well supported by the evidence, that the old rule of one inch per acre, adopted when irrigators were few and water was plentiful, should no longer be accepted as the standard guide on that subject. Considering the character of the proof submitted at the hearing on the duty of water the court is convinced that one inch per acre is excessive and that one half inch is ample for the successful irrigation of crops; and that means the so-called one half miner's inch per acre delivered upon the land to be irrigated.

Wherefore the court finds the issues herein in favor of the defendants in accordance with their respective claims as set forth in their answers, and relief will be awarded accordingly. Counsel will prepare and present proper findings, conformably with the views herein expressed. Such findings to be brief and based only upon ultimate facts.